Argued and submitted October 28, 1998, reversed and remanded in part; otherwise affirmed May 19, 1999

Donald OLSON,
*Appellant,*

*v.*

F & D PUBLISHING CO., INC.,
an Oregon corporation,
dba Signature Graphics,
and Brian Dutton,
*Respondents.*

(960402775; CA A97402)

982 P2d 556

Jay W. Beattie argued the cause for appellant. On the opening brief were Gilion C. Ellis, Glen McClendon and Lindsay, Hart, Neil & Weigler, LLP.

Stephen S. Walters argued the cause for respondents. With him on the brief were Scott E. Crawford and Stoel Rives, LLP.

Before Edmonds, Presiding Judge, and Linder and Kistler,* Judges.

KISTLER, J.

---

* Kistler, J., *vice* Warren, P. J., retired.

## KISTLER, J.

This case arises out of an employment dispute. Plaintiff claims that defendants breached their agreement with him when they failed to give him part of the company's stock. Alternatively, he claims that defendants misrepresented that they would give him part of the company's stock to induce him to come to work for them. The trial court granted summary judgment in defendants' favor on both claims and entered judgment for defendants. We affirm the trial court's judgment in part, reverse it in part, and remand.

Because this case arises on defendants' summary judgment motion, we state the facts in the light most favorable to plaintiff. In the early 1990s, plaintiff Donald Olson worked at RFD Publications. Defendant Brian Dutton was president of Signature Graphics. Over a period of several years, Dutton spoke with Olson about coming to work for Signature Graphics. In December 1994 and January 1995, their conversations became more serious. They agreed on the annual salary Olson would receive and that Olson would serve as Signature Graphics' president. They also discussed whether Olson would receive a percentage of Signature Graphics' stock.

According to Olson, the two men entered into two preemployment agreements concerning his acquisition of Signature Graphics' stock. First, before Olson began working for Signature Graphics, he and Dutton "agreed that [Olson] would receive a 10% ownership interest in Signature Graphics in consideration for [his] going to work for the company." Second, Olson expressed his interest in "acquir[ing] up to an additional 10% of the company," but he and Dutton "agreed that [they] would make a separate agreement [on acquiring additional stock through some type of bonus plan or other performance-based system] that [they] would finalize later." Olson acknowledged that when they reached their preemployment agreements, Dutton "told [him] that he needed to figure out how to transfer the stock because of certain tax implications." Olson "understood[, however,] that [Dutton] needed to address these issues for his own personal reasons. These issues had nothing to do with [him] or [his] contract with [Dutton and his company]."

Olson began working for Signature Graphics in January 1995. No stock was transferred to him. Approximately five months later, in May 1995, Olson retained an attorney who proposed that Dutton, Olson, and their attorneys get together to discuss the terms of Olson's employment. Olson's attorney suggested that the parties "look at factoring an employment contract into the discussions with stock, and any bonus compensation so that * * * the whole agreement came together at one time." There were two primary issues to be resolved at the meeting—Olson's equity interest in the company and his right to receive performance-based compensation in addition to his salary. The meeting occurred in late July. At the meeting, it became clear that Olson and Dutton had very different views about what, if anything, they had agreed before Olson came to work at Signature Graphics.

Shortly after the meeting, on July 28, 1995, Olson's attorney wrote a letter proposing that his client's present salary continue, that he receive 10 percent of the increases in the company's gross operating profits as additional performance-based compensation, and that he receive 15 percent of the company's stock, which would vest in three five-percent increments over a 30-month period. At the conclusion of his letter, Olson's attorney explained that he had not discussed these proposals in "any greater detail, because I want to see if they are headed in the right direction."[1]

Olson understood that Dutton and his attorney would make a counterproposal that would address those issues. As Olson explained, he viewed his attorney's July 1995 letter as "simply a concept or a vehicle to further some discussions. * * * [T]his wasn't a proposed deal." Indeed, Olson stated that even if Dutton had agreed to his attorney's July proposal on performance-based compensation, he would not have accepted it as a "stand-alone item." If, however, Dutton had agreed to Olson's attorney's proposal for both performance-based compensation and his acquisition of equity, Olson believed that it was "very likely" that they would have a deal. In any event, Olson explained that after his attorney

---

[1] According to Olson's affidavit, his attorney's proposal and the parties' negotiations were intended as a modification of the parties' preemployment agreements.

sent the letter, he expected to get something back from Dutton and his attorney that would lead to further negotiations.

A couple of weeks later, in early to mid-August, Olson had not received a response and asked Dutton about it. According to Olson, Dutton responded that "what I want to get to is this. I want to give you 15 percent of the company." Dutton also said, "I just want to find a way that I can give you 15 percent of the company." When Dutton used the phrase "find a way," Olson understood "that it's got to do with the taxing issues he has the attorney working on and et cetera." Olson responded, "[G]reat. That's acceptable to me. End of discussions. Let's put that down. Can we meet on that. Well, I'll have Bruce [defendants' attorney] work on it."[2]

Although Dutton's attorney intended to work on the agreement, he did not in fact produce one. Olson asked Dutton three or four times about Dutton's attorney's progress on the written agreement. As Olson testified, he either wanted to "have this thing done" by mid-December or "have the documents for me to review, the proposal of something coming back to me, whatever it is that [defendants' attorney] is working on [so] that I've got something that I can read and share with my attorney." Although the parties repeatedly set deadlines for Dutton's attorney to produce an agreement, none was forthcoming.

Olson initially believed that Dutton's delay in producing a written agreement was not a rejection of his demands but instead was "a deliberate tactic about timing and how he would ultimately put the whole thing together." Olson explained, however, that "[f]rom September to—through November, I got less and less confident that anything was ever going to happen, based on our agreements back in May, [to] sit down and get this thing done." When

---

[2] Olson's last sentence presumably repeats Dutton's response to him. Olson summarized his and Dutton's conversation in his affidavit:

"In August 1995, after several discussions concerning my acquisition of additional stock, Dutton offered me an additional 5% ownership interest, which I accepted. I believe this was a reasonable compromise. While I ended up with a 15% ownership interest rather than the 20% I had originally wanted, the additional 5% was to vest immediately and was not going to be tied to any bonus plan or be based on company performance."

asked what led him to that conclusion, Olson replied: "A complete lack of information, meetings, criteria by which these agreements were going to be developed, no further discussion, only delays, time delays setting—agreeing on deadlines. Yeah, we'll try to get that done * * * on three or four occasions and receiving no response of any kind in terms of partial progress or whatever." When Dutton's lawyer had not produced either a written agreement or "partial progress" on an agreement by December 1995, Olson submitted his resignation.

After he resigned, Olson sued Dutton and the company for breach of contract and misrepresentation. Defendants moved for summary judgment twice. The first time, the trial court granted defendants' motion on the misrepresentation claim. It denied their motion on the breach of contract claim but "only to the extent that there remains a triable issue whether plaintiff was induced to leave his former employment to join Signature Graphics * * * by an oral agreement between plaintiff and defendants that plaintiff would immediately receive ten percent of the stock of Signature Graphics at the outset of his employment."[3] Defendants filed a second summary judgment motion claiming that any preemployment agreement to transfer 10 percent of the company's stock had been impliedly modified. The court granted defendants' second motion and dismissed all aspects of plaintiff's claims. Plaintiff challenges both rulings on appeal.

We begin with the contract claim. As the parties frame the contract issues on appeal, there are two relevant events, each of which raises different questions. The first is the preemployment agreement to give Olson 10 percent of the stock on coming to work for the company. The second is the effect of the August 1995 agreement to give Olson an additional five percent of the company's stock.

■ On the preemployment agreement, defendants argue primarily that even if an enforceable agreement were formed, the parties modified it when plaintiff continued to

---

[3] The trial court granted summary judgment on plaintiff's contract claim "in all other respects."

work after learning that defendants did not intend to transfer any stock to him. They base their argument on the principle that an employer may unilaterally modify an at-will employee's contract and that the employee impliedly accepts the modification by continuing to work after learning of it.[4] *See Fish v. Trans-Box Systems, Inc.*, 140 Or App 255, 914 P2d 1107 (1996); *Albrant v. Sterling Furniture Co.*, 85 Or App 272, 736 P2d 201, *rev den* 304 Or 55 (1987). Defendants acknowledge that the legal principle they invoke only applies prospectively. As they correctly admit, "[a]n employer cannot inform an [at-will] employee that wages have been retroactively reduced * * *. Wages for past work within the employment relationship are 'earned' and 'vested.' " *See Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992). Given those legal principles, defendants' argument reduces to the question whether plaintiff's right to 10 percent of the stock was earned or became vested before he learned that defendants were not going to transfer any stock to him.

■■■ On that point, plaintiff testified in his deposition that the "terms of the [pre-employment] agreement as [he] understood it" were "ten percent vested equity going into the business from the get-go." He made similar statements in his deposition and affidavit. Given plaintiff's testimony, a jury reasonably could find that defendants promised plaintiff that they would give him 10 percent of the company's stock in return for his coming to work. It follows that when plaintiff began work in January 1995, his right to receive 10 percent of the company's stock was complete, or so a jury reasonably could find.[5] The fact that plaintiff continued to work after he

---

[4] Both plaintiff and defendants agree that plaintiff was an at-will employee. Defendants argue that plaintiff knew by September 1995 that they did not intend to transfer any stock to him. We assume but do not decide that this factual assertion is correct.

[5] Although defendants argue that this case is no different from *Fish*, we disagree. The employer in *Fish* promised that if the plaintiff worked 90 days, he would receive health benefits. 140 Or App at 257. The employer did not promise that if the plaintiff worked 90 days, he would receive health benefits for a set period of time. We held that the promise the employer made in *Fish* was modified when the plaintiff continued to work after learning that health benefits were not available. *Id.* at 259-60. We did not hold that if the plaintiff in *Fish* had earned the right to receive health benefits for a set period of time, the plaintiff would give up that vested right by continuing to work after learning that the employer intended to go back on his promise.

learned that defendants did not intend to give him any interest in the company does not defeat his right to receive the compensation he had already earned.

■ Defendants advance a second argument. They say that even if plaintiff did not impliedly modify any preemployment agreement, no enforceable preemployment agreement was ever formed. They argue that at most the parties' preemployment discussions produced an unenforceable agreement to agree. In part, they rely on the fact that after plaintiff started working for defendants, plaintiff's attorney proposed in July 1995 that the parties enter into a comprehensive agreement that would resolve the major aspects of plaintiff's employment relationship. The attorney's proposal and the negotiations that followed can be viewed either as confirmation of defendants' theory that they never entered into an enforceable preemployment agreement or, as plaintiff claims, as an attempted modification of their preexisting agreement. Because either inference can reasonably be drawn, the July negotiations provide no basis for saying, as a matter of law, that defendants are correct.

■■ Defendants also argue that because material issues were left unresolved, no enforceable preemployment agreement was formed. Defendants observe that "the parties never agreed as to when, how, or from whom Olson would receive any stock, and left entirely undecided how they would deal with the important tax and estate succession issues Dutton had raised." (Footnotes omitted.) Defendants do not appear to argue that those terms are material as a matter of law, nor would that argument be an easy one to make.[6] One party's

<hr>

The question of when a benefit is earned or vested will vary in each case depending on the terms of the contract and the nature of the promised benefit. *Compare Hughes*, 314 Or at 29 (right to future tax exemption vested for those pension benefits earned before the terms of employment were changed), *with Fish*, 140 Or App at 259-60. In this case, the evidence would permit the jury to find that the parties agreed that plaintiff "earned" 10 percent of the company's stock simply by coming to work for Signature Graphics.

[6] The question of when Olson would receive his stock may differ in terms of materiality from the other issues defendants group with it. Even if the timing of the transfer were a material element, plaintiff's evidence addressed that point. According to Olson, the right to receive his stock was complete when he came to work, and the jury could infer that he would receive the stock within a reasonable time. *See Taylor v. Wells*, 188 Or 648, 655, 217 P2d 236 (1950) (court may conclude that promised action will occur within a reasonable time).

ability to meet its contractual obligations or the financial consequences of its doing so is not ordinarily a material term of an employment agreement, although those issues may be material depending on the nature of the transaction and the parties' discussions. *See* Arthur L. Corbin, 1 *Corbin on Contracts* § 682 at 220-21 (1960 & 1998 Supp) (discussing terms of service contracts); *Povey v. Clow*, 146 Or App 760, 764, 934 P2d 528 (1997) (discussing potentially material terms in land sale contracts); *Miller v. Ogden*, 134 Or App 589, 600, 896 P2d 596 (1995) (Edmonds, J., concurring) (same). While a jury could infer that Dutton would not have entered into an agreement to give plaintiff stock until those issues were resolved, it also could draw the contrary inference. A jury reasonably could find that questions about the source of the stock that plaintiff would receive were internal issues for defendants to resolve.[7]

■ Defendants identify a final consideration that, in their view, demonstrates that the parties left material terms unresolved. They say that the parties left open how performance-based compensation would be calculated, whether plaintiff's stock acquisition would be tied to his performance, or how, if at all, plaintiff would acquire additional stock. Plaintiff, however, stated in his affidavit that the parties had two separate preemployment agreements. The first set his salary, identified his position, and gave him 10 percent of the company in return for coming to work there. The second was an agreement to agree on the terms defendants identify as open issues. If the jury believed plaintiff, it could find that the first agreement was enforceable while the second was not. *See Cook v. Desler*, 52 Or App 5, 12, 627 P2d 885, *rev den* 291 Or 368 (1981).

To be sure, defendants argue that plaintiff has impermissibly taken what was intended to be one agreement and treated it as if it were two. In light of plaintiff's affidavit, however, the question whether the parties intended to enter

---

[7] In his affidavit, Olson explained that he understood that defendants' concern about the tax consequences of the stock transfer "had nothing to do with me or my contract with defendants." Similarly, the jury could infer that the source of the stock defendants allegedly promised was solely an internal issue for them.

into two separate preemployment agreements or one comprehensive post-employment agreement is a disputed question of fact for the jury. The trial court erred in granting summary judgment on plaintiff's claim that defendants promised him 10 percent of the stock as part of a preemployment agreement.

■■ The remaining contract issue is whether summary judgment was appropriate on plaintiff's claim that defendants agreed in August 1995 to give him an additional five percent of the company's stock. Given plaintiff's affidavit, we start from the proposition that a jury could find that the parties reached agreement on transferring an additional five percent of the stock to plaintiff and that the right to that stock would vest immediately. *See* note 2 above. The issue that remains, however, is whether this agreement was intended to be a "stand-alone" agreement or one term of the larger employment contract the parties were negotiating. If the parties reached agreement on only one of several material terms in a larger contract, no enforceable agreement was reached. *See Wagner v. Rainier Mfg. Co.*, 230 Or 531, 540, 371 P2d 74 (1962).[8]

On that point, the July 1995 letter plaintiff's attorney wrote proposed that plaintiff's acquisition of equity would be one part of a larger agreement, which would include performance-based compensation. Plaintiff, for his part, testified at his deposition that his attorney's proposal on performance-based compensation was not intended to be a stand-alone issue. And he said that if defendants had agreed to both the proposals for performance-based compensation *and* the acquisition of equity in his attorney's letter, it was "very likely" that they would have had a deal. Plaintiff's own testimony shows that, as of July 1995, he wanted to resolve both the acquisition of stock and other employment issues,

---

[8] The parties' negotiations give rise to two potential issues, and it is important to distinguish them. The first is the one noted above, whether the August agreement on stock acquisition was intended to stand alone or be part of a larger agreement. If the parties intended that the August stock acquisition agreement would stand alone, the second issue is whether the fact that they intended to reduce that agreement to writing meant that it was not intended to be binding until written. We rest our holding on the first issue, not the second.

such as performance-based compensation, as part of one employment agreement.

The evidence does not suggest that plaintiff's understanding changed in August when Dutton allegedly said that he wanted to give plaintiff an additional five percent of the company's stock. Plaintiff testified at his deposition that from September through November 1995 he became concerned that defendants were not going to produce a written agreement. According to plaintiff, his concern was prompted by "[a] complete lack of information, meetings, criteria by which these agreements were going to be developed, no further discussion, only delays, time delays, setting—agreeing on deadlines" that were not met. If the written agreement were limited to his acquisition of additional stock, there would have been no apparent need for any further meetings or discussion. According to plaintiff, the discussions on that subject were complete in August. Similarly, if the written agreement were limited to the August agreement, it would not have been, in plaintiff's words, a "proposal of something coming back to me, whatever it is that [defendants' attorney] is working on" that he would review with his attorneys. Nor would the written agreement reflect, again in plaintiff's words, only "partial progress" on an agreement.

Factually, we are left in the following position. The record establishes that the parties entered into an agreement in August, which was capable of being enforced separately. The remainder of the record, however, negates the notion that the August agreement was intended to be separate from the larger employment agreement the parties were negotiating.[9] And there is no dispute that the parties never reached any agreement on the larger employment contract; plaintiff quit before defendants produced their draft of the proposed agreement. The court's decision in *Seeborg v. General Motors Corporation*, 284 Or 695, 701-02, 588 P2d 1100 (1978), makes

---

[9] We note that the August agreement to transfer an additional five percent of the stock differs from the preemployment agreement to transfer 10 percent of the stock in at least one significant respect. Plaintiff's affidavit states that the preemployment agreement was intended to be a separate agreement, which would be independently enforceable. His affidavit is silent on the question whether the August agreement was also intended to be separate, and his deposition testimony negates the notion that the August agreement was intended to stand alone.

clear that once defendants negated the proposition that the August agreement was intended to stand alone, plaintiff had to produce any contrary evidence he may have had if he wanted to avoid summary judgment on that issue. Plaintiff did not do so. The trial court correctly granted summary judgment on plaintiff's contract claim to the extent it was based on the August 1995 agreement.

■ The final issue is whether summary judgment should have been granted on plaintiff's misrepresentation claim. That claim is directed at the promise Dutton allegedly made when he induced plaintiff to come to work at Signature Graphics. Plaintiff claims that when Dutton promised, as part of the preemployment agreement, that he would give him 10 percent of the company in return for coming to work, Dutton was aware either that the statement was untrue or was reckless as to the truth or falsity of the statement. In their motion for summary judgment, defendants argued, and the trial court agreed, that even if they had made that promise, there was no evidence that they had done so falsely.

■ The fact that defendants did not perform their promise does not provide a basis for inferring that they made the promise fraudulently. *See, e.g., Butte Motor Co. v. Strand,* 225 Or 317, 321-22, 358 P2d 279 (1960); *Dolph v. Lennon's, Inc.,* 109 Or 336, 350-51, 220 P 161 (1923); *The Communications Group, Inc. v. GTE Mobilnet,* 127 Or App 121, 126, 871 P2d 502, *rev den* 319 Or 406 (1994). As those cases demonstrate, the courts have been reluctant to convert a party's exercise of his or her ability to breach a contract (and pay contract damages) into a fraud claim. Some additional evidence is necessary to find that a party entered into the contract with a fraudulent intent. *See The Communications Group, Inc.,* 127 Or App at 126.

Plaintiff argues that three additional facts would permit the jury to infer that defendants did not intend to carry out their promise when they made it. He notes that from the beginning of their negotiations, Dutton expressed concerns about the tax consequences of transferring stock as well as the effect of the transfer on his estate. He also points out that after he began work, Dutton repeatedly denied ever

agreeing to give him a portion of the company's stock. Plaintiff finally observes that in July 1995, approximately seven months after the alleged promise was made, Dutton stated that he had no intention of giving plaintiff stock.

Two of those facts, considered together, provide sufficient evidence to avoid defendants' motion for summary judgment. In July 1995, plaintiff proposed, as part of a modification of the preemployment agreement, that five percent of the stock would vest immediately. In response to that proposal, "Dutton expressed his frustration and stated that he had no intention of 'giving' stock (rather than selling it) to [plaintiff]." If the jury found that Dutton promised, as part of the preemployment agreement, to "give" plaintiff 10 percent of the stock in return for coming to work for the company, Dutton's statement that he had "no intention" of giving plaintiff any stock ordinarily would be sufficient to find that Dutton had not intended to carry out the promise when he made it. To be sure, Dutton's statement expressed his intent as of July 1995. The jury, however, could reasonably infer that his intent was the same in December 1994 when he allegedly entered into the preemployment agreement. Defendants point to nothing in the record that would require the jury to conclude that Dutton had intended to give plaintiff the stock in December 1994 when the promise was made but changed his mind by July 1995.

The first fact takes on added significance in light of the second. Beginning in December 1994, Dutton had expressed his concern about the tax and estate consequences of transferring stock to plaintiff. Because Dutton's reservations about the adverse consequences of transferring stock existed at the time he allegedly entered into the agreement, the jury reasonably could conclude that his decision not to transfer the stock did not arise after he made the agreement. Rather, it could conclude that he had no intention of giving plaintiff stock when he promised to do so. *See Building Structures, Inc. v. Young*, 131 Or App 88, 94, 883 P2d 1308 (1994), *aff'd* 328 Or 100, 968 P2d 1287 (1998) (defendants' testimony that they did not want plaintiff to manage the project sufficient to support claim that they fraudulently entered into

management agreement with plaintiff).[10] There was sufficient evidence to permit a reasonable jury to find that Dutton had no intention of carrying out the promise when he allegedly made it.[11] The trial court erred in granting summary judgment on plaintiff's misrepresentation claim.

Reversed and remanded on claims for 10 percent of the stock and misrepresentation; otherwise affirmed.

---

[10] There is some tension between the two facts on which plaintiff relies. Dutton's July 1995 statement denies an intent to give, as opposed to sell, the stock to plaintiff. His concern about estate and tax consequences presumably would attach to any transfer of the stock, whether by gift or sale. The jury, however, reasonably could infer that Dutton had no intention of incurring the tax and estate consequences associated with a gift of the stock but would have been willing to incur them if plaintiff had paid him something in return.

[11] Given our resolution of this issue, we do not reach the question whether a party's legitimate exercise of its right to dispute the terms of an oral contract may be considered as evidence of fraud in forming the contract.