Argued and submitted October 27, 1999, affirmed March 8, 2000

Joey URUO;
Jenna A. Uruo, a minor child,
by and through Amy E. Uruo, guardian ad litem;
and Amy E. Uruo,
*Appellants,*

*v.*

CLACKAMAS COUNTY;
James McQuay; Bruce C. Billesbach, Jr.;
George Craig; James Hinkley; Dan I. Johnson;
and State of Oregon, acting by and through the
Department of State Police;
Carla Muhs, Administrator of the Estate of
Tisha Anna Storm,
*Defendants,*

*and*

Bruce JENNESS
and City of Oregon City,
*Respondents.*

STATE OF OREGON;
Bruce C. Billesbach, Jr.; Craig George;
James Hinkley; Dan I. Johnson;
Clackamas County; and James McQuay,
*Third-Party-Plaintiffs,*

*v.*

Carla MUHS,
Administrator of the Estate of Tisha Anna Storm,
*Third-Party-Defendant.*

(9703-02451; CA A102616)

997 P2d 269

Susan K. Eggum argued the cause and filed the briefs for appellants.

Janet M. Schroer argued the cause for respondents. With her on the brief were Marjorie A. Speirs and Hoffman, Hart & Wagner.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J. '

## KISTLER, J.

The trial court ruled, on summary judgment, that the statute of limitations barred plaintiffs' negligence claim against defendant City of Oregon City.[1] The court reasoned that because plaintiffs had waited more than two years after they filed their tort claim notice to bring an action against Oregon City, their claim was barred as a matter of law. The court accordingly entered judgment in Oregon City's favor pursuant to ORCP 67 B. We affirm the trial court's judgment on different grounds.

Because this case arises on Oregon City's motion for summary judgment, we state the facts in the light most favorable to plaintiffs. *See Olson v. F & D Publishing Co., Inc.*, 160 Or App 582, 584, 982 P2d 556 (1999). On June 7, 1995, officers from the Clackamas County Sheriff's Office, the Oregon State Police (OSP), and the Oregon City Police Department were pursuing a car driven by Tisha Ann Storm. Twice during the pursuit, officers attempted a boxing maneuver to bring Storm's vehicle to a stop.[2] The first boxing maneuver failed after Storm rammed one of the police cars attempting to stop her. The second boxing maneuver failed after the Oregon City Police Chief, Bruce Jenness, ordered the Oregon City police officers to withdraw.[3] When the Oregon City officers withdrew, the other law enforcement agencies discontinued the second boxing maneuver.

Shortly after the second boxing maneuver ended, the Oregon City police officers dropped out of the pursuit. Officers from the Clackamas County Sheriff's Office and OSP continued to pursue Storm. One of the Clackamas County

---

[1] Plaintiffs brought a negligence claim against Oregon City and a federal civil rights claim against Bruce Jenness, the police chief of Oregon City. The trial court also granted summary judgment in Jenness's favor on plaintiffs' federal claim against him, but plaintiffs have not assigned error to that ruling.

[2] In a boxing maneuver, police attempt to stop a vehicle by positioning police vehicles in front, behind, and on each side of the suspect vehicle. Once all the police vehicles are in position, they gradually slow down and bring the suspect vehicle to a stop.

[3] Jenness was monitoring the pursuit by radio from the Oregon City police office when he ordered his officers to withdraw. There was evidence that decisions of that sort should be made by an officer who is on the scene.

officers shot one of Storm's tires, slowing her down. Storm, however, continued to elude the officers. She crossed the Interstate 205 bridge into Washington, made a u-turn, and began driving south in the northbound lanes of Interstate 205. Storm's car hit plaintiffs' car head-on, injuring plaintiffs seriously.

On November 7, 1995, plaintiffs sent tort claim notices to OSP, the Clackamas County Sheriff's Office, and the Oregon City Police Department. The notices stated that "each of the agencies participating in the pursuit conducted the pursuit in a negligent manner, which was a cause of each of the claimant's injuries and damages." By November 1995, plaintiffs had received the police reports from all the agencies that were involved in the pursuit. By January 4, 1996, they had also received a transcript of the radio communications among the officers. Plaintiffs knew or should have known from those reports and the transcript that Jenness, who was not on the scene, had ordered the Oregon City officers to withdraw from the second boxing maneuver. After consulting with their own experts and receiving a letter from Oregon City's insurer, plaintiffs concluded that Jenness's decision to order the Oregon City officers to withdraw from the second boxing maneuver either was not negligent or did not cause their injuries. Plaintiffs based their conclusion on two factors. First, they determined from the police reports that Storm had been driving between 60 and 80 miles per hour when the officers attempted the second boxing maneuver. Second, they concluded that because a boxing maneuver is neither safe nor reasonably likely to succeed at that speed, they had no claim against Oregon City.

When plaintiffs filed their first complaint on March 28, 1997, they named OSP, Clackamas County, and four OSP and Clackamas County officers as defendants; they did not name Oregon City or its officers as defendants.[4] In December 1997, plaintiffs deposed two Oregon City police officers, David Ratto and Rocky Smith, who had participated in the

---

[4] Initially, plaintiffs' claims against OSP and Clackamas County were based on their alleged failure to take appropriate steps to stop Storm after one of the officers shot out Storm's tires; that is, plaintiffs' claims against OSP and Clackamas County were based initially on those agencies' actions after the second boxing maneuver was aborted.

second boxing maneuver. Ratto testified that the second boxing maneuver had been a "perfect" or "textbook" box. According to Ratto, the maneuver slowed Storm's vehicle to 5 to 10 miles per hour before Jenness ordered the Oregon City officers to withdraw. In Ratto's opinion, when Jenness gave the order to withdraw, the pursuit was basically over. Smith testified that, in his opinion, there is no doubt that Jenness's order played a role in causing the collision.

On January 16, 1998, approximately two years and seven months after the accident, plaintiffs filed a third amended complaint. That complaint added a negligence claim against Oregon City based on Jenness's order to withdraw from the second boxing maneuver. Oregon City moved for summary judgment because plaintiffs' negligence claim against it was barred by the two-year statute of limitations. *See* ORS 30.275(8). There was no dispute that plaintiffs did not add Oregon City as a defendant until more than two years after their injury. The only issue was whether plaintiffs should have discovered that they had a claim against Oregon City sooner than they did.

Relying on *Adams v. Oregon State Police*, 289 Or 233, 611 P2d 1153 (1980), the trial court reasoned that, as a matter of law, plaintiffs' cause of action against Oregon City accrued when they gave the city tort claim notice on November 7, 1995. Because plaintiffs did not bring a claim against Oregon City within two years of that date, the trial court granted Oregon City's summary judgment motion and entered judgment in the city's favor pursuant to ORCP 67 B.

On appeal, the parties' arguments reduce to two issues. The first is whether the fact that a plaintiff gives a public body tort claim notice necessarily means that the plaintiff's tort claim has accrued. If it does not, then the remaining issue is whether plaintiffs either knew or should have known by January 4, 1996—after they had received the police reports and the transcript of the radio communications—that they had a tort claim against Oregon City.

■ We begin with the first issue. The trial court relied on *Adams* for the proposition that the statute of limitations begins to run from the day that a plaintiff gives a public body

tort claim notice. In *Adams*, the court held that the discovery rule applies to the 180-day period for giving tort claim notice as well as the two-year statute of limitations. 289 Or at 239. The court did not hold that the fact that a plaintiff gives a tort claim notice necessarily means that the statute of limitations also starts to run. To be sure, the fact that a plaintiff has sufficient information to give a tort claim notice will usually mean that he or she also has sufficient information to say that his or her cause of action has accrued. *See Gaston v. Parsons*, 318 Or 247, 255-56, 864 P2d 1319 (1994) (defining level of knowledge necessary to say that a cause of action has accrued). A plaintiff, however, may introduce evidence to call that logical inference into question and thus create an issue of fact as to the significance of the tort claim notice.

■ In this case, plaintiffs' attorney[5] submitted an affidavit stating that he had sent tort claim notices within 180 days of the accident as a precautionary measure but that, at that point, he had done "little or nothing in the way of investigation and had made no judgment as to whether plaintiffs had a good faith legal and factual basis for filing a lawsuit against any of the defendants." His affidavit goes on to say that, after reviewing the police reports and consulting with his experts, he concluded that Oregon City had not been negligent and that he did not know otherwise until he deposed Ratto and Smith. On this record, a factfinder reasonably could conclude that the fact that plaintiffs gave tort claim notice does not necessarily mean that they had sufficient information to say that their tort claim had accrued. Rather, plaintiffs' explanation creates a question of fact whether the statement in the tort claim notice should be taken at face value. On this record, the fact that plaintiffs gave tort claim notice does not provide a basis for granting Oregon City's summary judgment motion.

The remaining question is whether plaintiffs either knew or should have known by January 4, 1996, that they had a tort claim against Oregon City. By that date, plaintiffs had reviewed the police reports and had also received a transcript of the police radio communications. Plaintiffs either

---

[5] Plaintiffs' attorney on appeal did not represent plaintiffs initially.

knew or reasonably should have known that Storm had injured them, that Oregon City, along with OSP and Clacka-mas County, had attempted unsuccessfully to stop Storm, and that Jenness had ordered Oregon City's officers to with-draw from the second boxing maneuver. At oral argument, plaintiffs' attorney correctly acknowledged that ordinarily the knowledge that the second boxing maneuver had been aborted would be sufficient to place a reasonable person on inquiry notice. *See Doe v. American Red Cross*, 322 Or 502, 515, 910 P2d 364 (1996). Plaintiffs argued, however, that, on the facts of this case, that knowledge was not sufficient. Plaintiffs contended that, based on the police reports and their experts' analysis, they reasonably believed Storm was traveling between 60 and 80 miles per hour when the second boxing maneuver was attempted. Because a boxing maneu-ver is neither safe nor likely to be successful at such high speeds, plaintiffs contend that they had no reason to believe that Jenness's order was either tortious or a cause of their injuries until they deposed Ratto.[6]

The police reports do not consistently support the factual premise of plaintiffs' argument. Although the police

---

[6] The following colloquy occurred at oral argument:

THE COURT: "Where my quandary comes when I think about this case is whether that fact in and of itself, that there was a second attempt to box [Storm] in, is the kind of thing that raises a substantial possibility that the ele-ments of the tort exist and you would take the position that it does not."

PLAINTIFFS' ATTORNEY: "I take the position that it does, and here is how it is trumped * * * Here's how it's trumped, there is no question but that claim-ants knew that the City of Oregon City was participating in a second box attempt, the question becomes, *the key critical and defining question is, what was the speed of the suspect vehicle?* What was the driving behavior of the sus-pect vehicle? One of the police reports, at this very juncture, at Johnson Creek Boulevard, describes the vehicle as being bent on destruction and driving at speeds between 70 and 75. Other reports indicate her speed at this juncture on the freeway as between 60 and 80 miles an hour. That is the key defining moment in any claimant's determination of whether the element of tortuous conduct and causation is present. There's not a single police chase expert who could testify that at those speeds a successful box should have been completed, a successful box could have been executed and they didn't, not a single expert will come forward."

THE COURT: "So if you're in our shoes writing the opinion in this case, the opinion is going to turn on that fact."

PLAINTIFFS' ATTORNEY: "Yes sir."

(Emphasis added.)

reports do not all point in the same direction, they raise a substantial possibility that Storm could have been going as slowly as 20 miles per hour when the officers attempted the second boxing maneuver. We first describe the three police reports that discuss or bear on Storm's speed when the second boxing maneuver was attempted. We then explain why those reports were sufficient to put plaintiffs on notice that they should have investigated the second boxing maneuver sooner than they did.

The first report was submitted by Captain James McQuay of the Clackamas County Sheriff's Office. McQuay's report specifically discusses the first boxing maneuver, which ended when Storm rammed Deputy Krebs' police car. McQuay's report does not address the second boxing maneuver with any specificity, but it does state that at some point during that time Storm's "vehicle was traveling about 70 to 75 MPH."[7]

The remaining two reports specifically discuss the second boxing maneuver. Rocky Smith, an Oregon City police officer, submitted his report, in which he estimated initially that Storm's speed was between 70 and 80 miles per hour. He then described the officers' attempt to perform the first boxing maneuver, which ended when "the suspect vehicle rammed Deputy Kre[bs'] vehicle in the right rear quarter panel with its left front fender." Smith's report goes on to describe the second boxing maneuver:

> "The suspect then drove into the grass median and appeared to be headed for the oncoming southbound lanes. It then veered right and back onto the northbound lanes and continued on. Several units again prepared for a boxing

---

[7] McQuay's report states:

"The suspect got by Deputy Krebs [and thus avoided the first boxing maneuver], apparently after ramming into him and then going into the center divider.

"We attempted to stop the vehicle in the divider grass area but she was able to get away. During this time she made a couple of runs at the lead [OSP] car, appearing to be trying to ram him. The [OSP] car veered out of her way. It became very apparent that the driver of the suspect vehicle was bent on destruction. She was waving the V (peace sign) out the window and using the entire freeway including safety lanes and grass median for travel. *The vehicle was traveling about 70 to 75 MPH.*"

(Emphasis added.)

maneuver. At that point I was contacted by my supervisor and [was] advised that [Oregon City Police Department] units should not participate in a boxing maneuver. I instructed [Oregon City Police] Officer Ratto to back out and follow at a distance. We then acted as support vehicles.

"The suspect vehicle continued its erratic driving and *increased its speed again.*"

(Emphasis added.)

Finally, a report filed by a Clackamas County sheriff's deputy, Edwin Krebs, explained that the first boxing maneuver ended when Storm "swerved behind me ramming my vehicle in the rear right [bumper] area." He stated that Storm "then proceeded into the grassy center area of I-205 separating north and south bound traffic." Krebs "slowed further" to let Storm go back in front of him and thus get back in the northbound lanes. Krebs wanted to avoid forcing Storm into the oncoming south-bound traffic. Storm went ahead of Krebs and "dodging the other patrol cars continued north bound in the north bound lanes of I-205." Krebs explained that Storm was driving very erratically swerving from lane to lane. He pulled close to her and "screamed for her to pull over at which time she gave me the peace sign again with her hand. *She then sped ahead.*" (Emphasis added.) Krebs' report concluded: "Not keeping a close watch on my speedometer my vehicle speed range was from about *20 mph to approx. 70 mph.* * * * As we attempted to set up another vehicle block [the second boxing maneuver] we were informed not to use the vehicles as a blockage (by radio)." (Emphasis added; parenthetical in original.)

The three reports do not look in the same direction. McQuay's report supports plaintiffs' position; it says that Storm's speed was between 70 and 75 miles per hour. The two other police reports raise a substantial possibility that Storm's speed could have been lower when the officers attempted the second boxing maneuver. Smith's police report initially estimates Storm's speed at between 70 and 80 miles per hour but then describes the first attempt to box Storm, which ended when she rammed Krebs' police car and drove onto the grassy median. He describes the second attempt to box Storm, which Jenness called off, and says "[t]he suspect

vehicle continued its erratic driving and *increased its speed again.*" (Emphasis added.) Two inferences may fairly be drawn from Smith's report. First, Storm's speed decreased at some point. Second, after the second boxing maneuver, Storm's car "increased its speed again." It is unclear, however, from Smith's report how low Storm's speed dropped before it "increased * * * again." ·

■ Krebs' report adds telling details. It says that he was driving from 20 to 70 miles per hour during the relevant period. Because he was pursuing Storm, Krebs' report suggests that Storm's speed also varied between 20 and 70 miles per hour. To be sure, it is unclear exactly how fast Storm was driving when the second boxing maneuver was attempted. She may have been driving as slowly as 20 miles per hour. She may, however, have been going as fast as 70 miles per hour although it is unlikely that, if she were going that fast, Smith would have said that Storm "increased [her] speed again" after Oregon City's officers withdrew from the second boxing maneuver.

■ A plaintiff need not have actual knowledge of tortious conduct before the statute of limitations will begin to run. *Gaston*, 318 Or at 256. Conversely, a mere suspicion is not enough. *Id.* Rather, the "statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists." *Id.* As the court explained in *Gaston*, "[r]elevant to this analysis will be a plaintiff's failure to make a further inquiry if a reasonable person would have done so." *Id.*; *accord Greene v. Legacy Emanuel Hospital*, 165 Or App 543, 997 P2d 265 (2000). In *Doe*, the court explained that the fact that the plaintiff knew that her husband had received an infusion of contaminated blood and had been injured as a result put the plaintiff on inquiry notice, as a matter of law, to determine whether the blood supplier had acted tortiously. 322 Or at 515. The court held, however, that summary judgment was not appropriate in that case because there was no evidence of what the plaintiff would have learned if she had inquired. *Id.*

 In this case, plaintiffs had evidence in their possession that Storm could have been driving anywhere from 20 to 70 miles per hour when the officers attempted the second boxing maneuver. Although the evidence does not establish definitively how fast Storm was going when the officers attempted the second boxing maneuver, the reports raise a substantial possibility that she was going slowly enough for the maneuver to have succeeded. At a minimum, the reports should have put plaintiffs on notice that they needed to inquire further. *See Doe*, 322 Or at 515. And, unlike the record in *Doe*, this record reveals what plaintiffs would have learned had they inquired. Given the police reports, plaintiffs should have been aware of a substantial possibility that they had a tort claim against Oregon City no later than January 4, 1996. The statute of limitations began to run from that date.[8] Because plaintiffs did not file their complaint against Oregon City until January 16, 1998, their claims against Oregon City are barred by the statute of limitations. *See* ORS 30.275(8).

Affirmed.

---

[8] Two points should be noted. The fact that Oregon City's insurer told plaintiffs that its client was not culpable does not bear on the analysis. Unlike the physician in *Gaston*, Oregon City's insurer did not stand in a position of trust and confidence with plaintiffs. Second, plaintiffs argue that Jenness may have tried to cover up any mistake. Even if that were true, the evidence contained in the officers' reports was sufficient to put plaintiffs on notice that they needed to inquire further.