Argued and submitted May 20, 2010, reversed and remanded with respect to plaintiff's first claim for relief; otherwise affirmed March 2, petition for review denied July 28, 2011 (350 Or 571)

William YEOMAN,
Personal Representative of
the Estate of Anita Yeoman, Deceased,
*Plaintiff-Appellant,*

*v.*

PUBLIC SAFETY CENTER, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Lane County Circuit Court
160718230; A140041

250 P3d 411

C. Robert Steringer argued the cause for appellant. With him on the briefs were William F. Gary and Harrang Long Gary Rudnick P.C.

Dan Webb Howard argued the cause for respondent. With him on the brief was Gleaves Swearingen LLP.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Plaintiff, the personal representative of his wife's estate, brought this action seeking a declaration that he is a shareholder of defendant Public Safety Center, Inc., and, for that reason, is entitled to inspect the corporation's records. Plaintiff alleged that his wife, prior to her death, had been promised a share of ownership in defendant in exchange for her service to the company and that she had, in fact, received dividends from the company in the years after her employment ended. Defendant, in response, moved for summary judgment on the ground that no such dividend had been paid and that plaintiff could present no evidence that his wife actually became a shareholder. According to defendant, plaintiff's wife is not listed on the corporation's records, filings, or tax forms, and no stock certificates were ever issued to her. The trial court granted defendant's motion, and plaintiff now appeals. We reverse in part and remand.

We state the facts—sparse though they are—in the light most favorable to plaintiff, the nonmoving party. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004). Defendant is a closely held corporation. Its president, Tardie, and his wife, the company's secretary, are its only registered shareholders and its only directors. Prior to her employment with defendant, Anita Yeoman, along with her husband, William Yeoman, visited the Tardies' home. The purpose of the meeting was to discuss the terms of Anita's potential employment with defendant. During that meeting, Tardie told Anita and William that he "was going to make [Anita] a 10% shareholder in exchange for going to work." Just before they left, Tardie told her that "she would start at 2% per year, so that it would take five years for her to earn the full 10%."

Shortly thereafter—sometime in late June 2001, it appears[1]—Anita went to work for defendant. She worked for

---

[1] The record is convoluted regarding the dates of her employment. Plaintiff's complaint alleges that Anita began working for defendant "[i]n or about July of 2002," and defendant admitted that allegation in its answer. In his opening brief, plaintiff asserts that Anita went to work for defendant on June 14, 2002, and then cites portions of the record that reflect that she was *terminated* on June 14, 2002. In any event, the parties appear to agree that Anita was terminated by defendant just prior to her one-year anniversary.

defendant until early June 2002, just prior to her one-year anniversary. At that point, defendant terminated her employment. An "Employee Exit Interview Form" indicates that she was discharged for "unexcused absence" and because she was "unproductive." Anita's base-year wages at the time of her termination were approximately $45,000.

In the years following her termination, Anita received checks from defendant. The first check, in the amount of $1,871.54, was dated August 2004. Around the time that Anita received the check, Tardie telephoned the Yeoman house and spoke with William. Tardie was "calling about the 2%" either to say that "the check had been mailed" or to be certain that the Yeomans had received it. Defendant sent another check to Anita the following June, this time in the amount of $7,175.00. The company sent her a third check in June 2006, in the amount of $13,117.54.

In December 2006, Anita's attorney sought access to defendant's corporate records in order to "determine the potential value of [Anita's] stock, and to determine whether she has been paid the appropriate amount for her dividends." Anita died in a car accident on June 13, 2007, before the question of access to the company's records had been resolved. Plaintiff, in his capacity as the personal representative of her estate, then filed this action in August 2007, seeking, in his first claim for relief, a declaration that he is a "4% shareholder of Defendant, and for such other and further supplemental relief as may be appropriate, including an order requiring the payment of delinquent dividends." In a second claim for relief, plaintiff sought an order requiring defendant to permit plaintiff to inspect and copy corporate records.

Defendant, in response, moved for summary judgment on both claims for relief. In support of its motion, defendant argued that plaintiff's claim that Anita was a shareholder "is entirely unsupported by any documentation or evidence that reflects ownership of any shares or interest in [defendant]." Her name, defendant argued, "is found nowhere in the pertinent corporate records, filings, or tax forms as a shareholder and no [Public Safety Center, Inc.] stock certificates were ever issued to her." Thus, defendant contended, "[p]laintiff's evidence supports the existence of a

profit-sharing agreement between Anita Yeoman and [defendant], but does not rise to the level of creating a genuine dispute that Anita Yeoman was a shareholder in [defendant]." Plaintiff, in opposition, pointed specifically to the "very odd amounts of money" paid to Anita on an annual basis after she left the company. Plaintiff attached a copy of a letter sent by defendant's counsel during a discovery dispute in this case; in that letter, defendant's counsel stated, "I believe that any monetary distribution to Anita Yeoman, other than wages, was a gift calculated on the basis of 2% of some aspect of Public Safety Center's financial performance."

The trial court granted defendant's motion and entered judgment dismissing plaintiff's claims. Plaintiff now appeals, arguing that, viewing the evidence in the light most favorable to him, a reasonable factfinder could conclude that Anita became a shareholder and was paid dividends, even if the corporation never formally recorded her status as a shareholder. In plaintiff's view, defendant's failure to account for Anita's shares is not conclusive as to her ownership; rather, he argues, it is evidence that a trier of fact can consider in determining whether she became a shareholder. Defendant, meanwhile, reprises its argument that shareholder status requires corporate formalities that did not occur in this case.

Before delving into the parties' respective arguments as to whether plaintiff should be declared a "shareholder" of defendant, we must first determine what plaintiff means by that term. The term "shareholder" is defined for purposes of the Oregon Business Corporation Act, ORS chapter 60, as "the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." ORS 60.001(29).[2]

Plaintiff does not argue that Anita was, in fact, a "shareholder" within the definition set out in the Oregon Business Corporation Act. Nor is there any evidence in the

---

[2] In various parts of ORS chapter 60, that definition is modified for particular purposes. *See, e.g.*, ORS 60.261(4); ORS 60.551(7); ORS 60.774(6); *see also* ORS 60.830 (defining "owner" of and to "own" shares for purposes of business combinations with interested shareholders).

record that any shares were registered in Anita's name or that she was a beneficial owner under a nominee certificate on file with defendant.[3] Rather, plaintiff contends that his complaint seeks, more generally, a declaration that Anita was a shareholder "in the general sense of that term—a person who owns stock in a corporation." If that relief were granted, plaintiff submits, he "could then request supplemental relief that would include an order that the shares be registered in the records of the defendant corporation to validate his rights as a shareholder for purposes of ORS chapter 60."

We agree that plaintiff's complaint can be construed as seeking a declaration that Anita (and, now, plaintiff as the personal representative of her estate) is the owner of shares in the corporation. Accordingly, we limit our analysis to that question: Did plaintiff demonstrate a genuine issue of material fact as to whether Anita became the owner of shares of defendant?

Plaintiff contends that, in order for a person to acquire shares of a corporation, two things must occur: One, the company must enter into an agreement with the prospective purchaser for the sale of the shares; and, two, the purchaser must actually pay for those shares pursuant to that agreement. At that point, in plaintiff's view, ownership of the shares has passed to the purchaser, even if the company has not registered that transaction in its corporate records.

Defendant, meanwhile, characterizes plaintiff's theory as one of "spontaneous transfer"—a theory that, according to defendant, this court rejected in *Olson v. F & D Publishing Co., Inc.*, 160 Or App 582, 982 P2d 556 (1999). Defendant takes the position that, in the context of a services arrangement like the one Anita and defendant purportedly entered into, more is required than an agreement to make someone a shareholder. Rather, defendant argues, a corporation must actually *issue* the shares, through a process that involves certain corporate formalities—for example, the

---

[3] *See* ORS 60.234(1) ("A corporation may establish a procedure by which the beneficial owner of shares that are registered in the name of a nominee is recognized by the corporation as the shareholder. The extent of this recognition may be determined in the procedure.").

board of directors approving the consideration received for the shares. ORS 60.147(3) ("Before the corporation issues shares, the board of directors must determine that the consideration received or to be received for shares to be issued is adequate. * * * A record of action by the board of directors authorizing the issuance of shares for a specified consideration may be relied upon in concluding that shares are validly issued, fully paid and nonassessable."). According to defendant, there is no evidence whatsoever that any of those formalities occurred here. For the reasons that follow, we agree that defendant must have actually issued shares to Anita in order to make her a shareholder; however, we conclude that, on this record, there exists a genuine issue of material fact as to whether that happened.

■       The primary question on appeal reduces to how a corporation transfers ownership of "shares"—"the units into which the proprietary interest in a corporation are divided." ORS 60.001(28).[4] Under ORS 60.144, the initial purchase of shares of a corporation is accomplished through a "subscription" for shares, either before or after incorporation. "A subscription agreement entered into after incorporation is a *contract* between the subscriber and the corporation *subject to ORS 60.147*." ORS 60.144(5) (emphasis added).

ORS 60.147, in turn, provides:

"(1)    The powers granted in this section to the board of directors may be reserved to the shareholders by the articles of incorporation.

"(2)    *The board of directors may authorize shares to be issued for consideration consisting of any tangible or intangible property or benefit to the corporation, including cash, promissory notes, services performed, contracts for services to be performed or other securities of the corporation.*

"(3)    *Before the corporation issues shares, the board of directors must determine that the consideration received or*

---

[4] Under Oregon law, a corporation is authorized to issue only "the number of shares of each class or series authorized by [its] articles of incorporation." ORS 60.137(1). Evidence in the record indicates that defendant is authorized to issue 500 shares under its articles of incorporation, and that Tardie and his wife together own 100 shares.

*to be received for shares to be issued is adequate.* That determination by the board of directors is conclusive insofar as the adequacy of consideration for the issuance of shares relates to whether the shares are validly issued, fully paid and nonassessable. A record of action by the board of directors authorizing the issuance of shares for a specified consideration *may be relied upon in concluding that shares are validly issued, fully paid and nonassessable.*

"(4)   *When the corporation receives the consideration for which the board of directors authorized the issuance of shares, the shares issued therefor are fully paid and nonassessable.*

"(5)   The corporation may place in escrow shares issued for a contract for future services or benefits or a promissory note or make other arrangements to restrict the transfer of shares, and may credit distributions in respect of the shares against their purchase price, until the services are performed, the note is paid or the benefits received. If the services are not performed, the note is not paid or the benefits are not received, the shares placed in escrow or restricted and the distributions credited may be canceled in whole or in part."

(Emphasis added.)

Importantly, shares "[m]ay be *but are not required to be represented by certificates*," and unless otherwise provided by statute, "the rights and obligations of shareholders are identical whether or not their shares are represented by certificates." ORS 60.161(1) (emphasis added); *see also* ORS 60.161(2) - (5) (setting forth form and content requirements for share certificates); ORS 60.164(1) ("Unless the articles of incorporation or by-laws provide otherwise, the board of directors of a corporation may authorize the issue of some or all of the shares of any or all of its classes or series without certificates.").

From the foregoing provisions of the Oregon Business Corporation Act, we glean the following: (1) a subscription agreement is a contract between the subscriber and the corporation, ORS 60.144(5); (2) consideration for that contract may consist of "services performed" or "contracts for services to be performed," ORS 60.147(2); (3) before the corporation issues shares, the board of directors must determine that the consideration received or to be received for shares to

be issued is adequate, ORS 60.147(3); (4) once the corporation receives the consideration for which the board of directors authorized the issuance of shares, the "shares issued therefor are fully paid and nonassessable," ORS 60.147(4); and (5) share certificates are evidence of, but not prerequisites to, shareholder rights, ORS 60.161(1); *Babbitt v. Pacco Investors*, 246 Or 261, 271, 425 P2d 489 (1967) ("Neither is it necessary, in order for one to become a shareholder, that a certificate of stock, which is only evidence of ownership of an interest in the assets of the corporation, shall have been issued.").

■ Read together, those statutory requirements provide that, in the context of a subscription agreement based on services, ownership of shares passes once the corporation has received full consideration for authorized shares pursuant to the terms of the subscription agreement. In other words, the shares are deemed to have "issued" and to "be fully paid and nonassessable" once the corporation accepts payment in exchange for consideration for the authorized shares. *Cf. Babbitt*, 246 Or at 270 (citing case law for the proposition that "payment is essential where the subscription is for shares of an existing corporation"); *see also* Mark S. Rhodes, *Transfer of Stock* § 2.8, 45 (7th ed 2006) ("[A] stock certificate is not necessary to the ownership of stock, and, as a legal matter, stock may be considered issued prior to the issuance of a certificate. * * * Acceptance of payment for the stock may be considered issuance, regardless of the execution and delivery of a certificate.") (footnote omitted); *id.* at 46 ("It has been said that * * * 'it is the payment, or the obligation to pay, for shares of stock, accepted by the corporation, that creates both the shares and their ownership.'" (quoting *Illinois-Indiana Fair Ass'n v. Phillips*, 328 Ill 368, 376, 159 NE 815 (1927))).

Viewing the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in his favor, a trier of fact could reasonably conclude that defendant issued shares to Anita. There is evidence that the corporation offered Anita shares of the company in the amount of "2% per year," such that it would take "five years for her to earn the full 10%"; that Anita then went to work for defendant and performed services for defendant pursuant to her agreement to receive shares; that Anita received checks after her

employment ended "on the basis of 2% of some aspect of [defendant's] financial performance";[5] and that defendant's president called Anita "about the 2%" to make sure that she had received her check.

Defendant suggests that a factfinder would be required to impermissibly speculate that the post-employment checks to Anita were, in fact, dividend payments, because "the payments could be evidence of *virtually anything*." (Emphasis by defendant.) We disagree. There may be other reasonable explanations as to why Anita received yearly payments after her employment with defendant was terminated, but the task of choosing among reasonable inferences is not the same as speculation. On these facts, one reasonable inference that a factfinder could draw is that the payments were, indeed, dividends, particularly in light of Tardie's alleged promises and follow-up phone call regarding the "2%." *Cf. Babbitt*, 246 Or at 271 ("It may be added that * * * the corporation recognized the plaintiff as a shareholder by sending him notices of stockholders' meetings [even though no stock certificates had been issued to him].").

A factfinder could further infer, on the facts of this case, that defendant's board of directors had authorized the issuance of the shares in exchange for Anita's services. Defendant is a closely held corporation. Its sole registered shareholders are Tardie, the company's president, and his wife, the company's secretary; the two also comprise the company's board of directors. A factfinder would be entitled to infer, from the fact of the dividend payments, that defendant's board knew of and authorized the promise to make Anita a shareholder, accepted Anita's service as payment for the shares, and later paid her dividends as a shareholder. The fact that the corporation's records do not reflect any issuance of shares to Anita might be *evidence* that no such shares were ever issued, but it is not fatal to plaintiff's claim that Anita was a shareholder. *Cf. Babbitt*, 246 Or at 271 (certificate is "only evidence of ownership of an interest in the assets of the corporation"). In sum, on the record before us, there is

---

[5] Defendant does not dispute the admissibility of evidence of defendant's counsel's letter on that point.

a genuine issue of material fact as to whether defendant issued stock to Anita.

For that reason—*i.e.*, that a factfinder could find that defendant actually "issued" stock without documenting it—this is not a "spontaneous transfer" case. Nor is *Olson*, as defendant argues, "directly on point." That case involved claims of breach of contract and misrepresentation by an employee who alleged that the defendants, the corporation and its president, had induced his employment with the promise of transferring stock to him and then never performed that promise. Thus, the gravamen of the plaintiff's claims in *Olson* was that he *never became a shareholder*, because the promise to transfer shares of the corporation was not performed. Here, by contrast, plaintiff alleges that the promise to make Anita a shareholder was fully performed (and dividends paid), but that her shareholder status simply is not reflected in the records of the corporation. For that reason, and the others stated above, we conclude that the trial court's grant of summary judgment on plaintiff's first claim for relief cannot be sustained on the ground that the corporation's records do not reflect the issuance of those shares.

■ Defendant advances various alternative bases for upholding the trial court's grant of summary judgment on plaintiff's first claim for relief, none of which we find persuasive. First, defendant contends that the alleged agreement to make Anita a shareholder is void under the statute of frauds. Defendant did not advance that argument until its reply brief in the trial court; even assuming, however, that the statute of frauds issue was properly before the trial court and now us, it does not provide an alternative basis for the grant of summary judgment, because there are unresolved factual issues regarding potential defenses to the statute of frauds, such as partial performance.[6]

Second, defendant advances a number of theories as to why its purported agreement with Anita is unenforceable,

---

[6] Indeed, it is not even clear that the statute of frauds is applicable. *See* ORS 78.1130 ("A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.").

including that the alleged promise to make Anita a shareholder is too indefinite to serve as the basis for a valid contract. Those bases for summary judgment were not the subject of defendant's motion; had they been raised in the initial motion, the record below might have developed differently. For that reason, we do not discuss them further. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001) ("[I]f the losing party might have created a different record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance." (Emphasis omitted.)).

■    We next turn to the trial court's grant of summary judgment on plaintiff's second claim for relief, which alleges a statutory right to inspect and copy corporate records under ORS chapter 60. Plaintiff alleges that he "sent a statutory demand, pursuant to ORS 60.774, to inspect and copy designated corporate records." ORS 60.774(1) provides that "a shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, any of the records of the corporation described in ORS 60.771(5)" so long as the shareholder gives the corporation sufficient written notice of the shareholder's demand. In the event that the corporation refuses to allow such an inspection, ORS 60.781 provides a remedy:

> "If a corporation does not allow a shareholder who complies with ORS 60.774(1) to inspect and copy any records required by that subsection to be available for inspection, the circuit court of the county where the corporation's principal office is located, or, if the principal office is not in this state, where its registered office is or was last located, may summarily order inspection and copying of the records demanded at the corporation's expense upon application of the shareholder."

ORS 60.781(1).

As previously discussed, the term "shareholder" is defined for purposes of ORS chapter 60 as "the person in whose names shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the

rights granted by a nominee certificate on file with a corporation." ORS 60.001(29). There is no evidence in this record that Anita's shares were ever registered in the records of the corporation.[7] And it is "shareholders" as defined in ORS chapter 60—and not simply the owners of shares of the corporation in the general sense—that have statutory inspection rights under ORS chapter 60. *Cf. Babbitt*, 246 Or at 271 (holding, under earlier version of Oregon corporation statutes providing inspection rights to "shareholders of record," that "any record kept by the corporation which enables it to determine whether a person seeking examination of its books is a shareholder should be deemed sufficient").

In this particular case, it appears that plaintiff's second claim for relief was premature. If, as plaintiff contends, Anita acquired an ownership interest in the corporation that simply is not reflected anywhere in the corporation's records, the proper course is to obtain injunctive relief such that the corporate records reflect that share ownership, thereby triggering statutory "shareholder" inspection rights under ORS chapter 60. Indeed, plaintiff acknowledges as much, arguing that, upon obtaining a declaration of shareholder status, he "could then request supplemental relief that would include an order that the shares be registered in the records of the defendant corporation to validate his rights as a shareholder for purposes of ORS chapter 60." However, until that time, plaintiff's right to inspect defendant's records is a matter of discovery rather than a product of ORS chapter 60. *See* ORS 60.774(5) ("This section does not affect: (a) The right of a shareholder to inspect records under ORS 60.224 or, if the shareholder is in litigation with the corporation, to the same extent as any other litigant; or (b) *The power of a court, independent of this chapter, to compel the production of corporate records for examination.*" (Emphasis added.)). For that reason, the trial court did not err in granting summary judgment on plaintiff's claim to inspect defendant's records pursuant to ORS 60.781, because there is no evidence that Anita was a "shareholder" within the meaning of that statute at the

---

[7] That definition is expanded in the case of shareholder inspection rights to "include[ ] a beneficial owner whose shares are held in a voting trust or by a nominee on behalf of the beneficial owner." ORS 60.774(6). That expanded definition does not help plaintiff.

time of the December 2006 demand to inspect the corporation's records.

Reversed and remanded with respect to plaintiff's first claim for relief; otherwise affirmed.