Argued and submitted February 17, reversed and remanded in part; otherwise affirmed September 30, 1998

Tulio A. ANGELINI
and Florence B. Angelini,
husband and wife,
Charles J. Botti, Jr., Alexander Briones,
Dominador Briones, III,
Donato Carreta and Alice M. Carreta,
husband and wife,
John M. Doyle,
Robert Galligani and Diane Galligani,
husband and wife,
Albino A. Ravella and Antonia T. Ravella,
husband and wife,
and Michael J. Rush,
and Frank R. Delosa and Clella Delosa,
husband and wife,
*Appellants,*

*v.*

Richard DELANEY
and Dolphin Real Estate Group Investments, Inc.,
*Respondents.*

(9505-02954; CA A92691)

966 P2d 223

David J. Sweeney argued the cause for appellants. With him on the briefs were Paul G. Dodds and Brownstein, Rask, Arenz, Sweeney, Kerr & Grim, LLP.

Lynn R. Nakamoto argued the cause for respondents. With her on the brief were Lynn R. Stafford and Markowitz, Herbold, Glade & Mehlhaf, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiffs appeal, seeking reversal of a judgment and supplemental judgment for defendants on counterclaims for, *inter alia*, imposition of an equitable lien, breach of contract, unjust enrichment, money had and received, and contribution, all arising from defendants' management of a mobile home park owned by plaintiffs. The principal issues pertain to plaintiffs' liability to defendants with respect to monies borrowed from third parties to obtain funds to operate the mobile home park. We affirm in part and reverse in part.

The material facts are as follows: In 1980, plaintiffs, who are all California residents, purchased the Vista Park Mobile Home Estates (Vista), a mobile home park in Hermiston. From the time of plaintiffs' purchase of Vista until December 1988, plaintiffs employed defendant Dolphin Real Estate Group Investments, Inc. (Dolphin), a California corporation, to manage the mobile home park.

Dolphin, a closely held corporation, was operated by plaintiff Charles Botti, defendant Richard Delaney, and a third principal, Konrad von Emster. From 1980 to 1988, Botti and Delaney were shareholders, directors, and employees of Dolphin. In 1980, Botti also purchased an ownership interest in Vista and retained that interest at all material times.

Soon after plaintiffs purchased Vista, the park experienced cash flow problems. Dolphin discussed the adverse cash flow situation with plaintiffs, but they refused to contribute cash for Vista's operations. In November 1981, to obtain funds to operate Vista, Dolphin, without authorization from plaintiffs, borrowed $5,000 from the Forestview Mobile Home Park, which Dolphin also managed, executing a promissory note in that amount.

In June 1982, as Vista's cash flow problems continued, Dolphin called a meeting to discuss those problems. Plaintiffs, while continuing to refuse to advance cash to fund the park's operation, ultimately agreed to borrow funds to operate the park. Plaintiffs, except for the Angelinis and Doyle, signed a promissory note and a trust deed in favor of Dolphin in the amount of $20,000. The deed of trust not only secured the $20,000 note, but it also secured "such further

sums as the then record owner of said [Vista] property hereafter may borrow from the beneficiary [Dolphin]." Plaintiffs asked Dolphin not to record the deed of trust because recording might damage plaintiffs' ability to refinance the property. Botti assured Dolphin that plaintiffs' loan obligations would be paid when the property was sold or refinanced. Based on that representation and similar acknowledgments, Dolphin did not record the deed. Notwithstanding the execution of the promissory note and trust deed, as described below, Dolphin itself never directly loaned plaintiffs $20,000.

After the parties executed the note and trust deed, plaintiffs authorized Dolphin, as Vista's managing agent, to borrow funds from third parties to operate Vista. Plaintiffs represented that, upon the sale or refinancing of the Vista property, plaintiffs would repay Dolphin for obligations Dolphin assumed on plaintiffs' behalf. From November 1982 until October 1983, Dolphin, as Vista's managing agent, six times borrowed funds from different mobile home parks that it managed.[1] On each occasion, Dolphin, as Vista's managing agent,[2] executed a promissory note in favor of the lending park. Each note provided that the loan was payable "on demand" and provided for attorney fees in the event of an action on the note.

Those six loans, along with the initial November 1981 loan, brought the total indebtedness to the third-party

---

[1] The amounts Dolphin borrowed from other mobile home parks, including the initial, November 1981, loan, are as follows:

| Date | Amount | Obligee |
|------|--------|---------|
| 11/01/81 | $ 5,000 | Forestview |
| 11/01/82 | 5,000 | Greenwood/South End |
| 11/01/82 | 15,000 | Forestview |
| 11/01/82 | 15,000 | Spanish Flat |
| 03/01/83 | 3,000 | Columbia North |
| 10/01/83 | 10,000 | Paradise Valley |
| 10/01/83 | 20,000 | Columbia North |

Dolphin's principals held ownership interests in some, and perhaps all, of the lending parks.

[2] Von Emster signed each note.

mobile home parks to $73,000. In addition, in August 1985, Dolphin itself loaned $7,500 to plaintiffs, receiving a promissory note.

In obtaining the loans from the other mobile home parks, Dolphin guaranteed repayment when the lending parks were sold. In accordance with that guarantee, as each mobile home park was sold, Dolphin purchased the promissory note, repaying with interest the funds borrowed on plaintiffs' behalf. Plaintiffs themselves made no payments on the promissory notes. To obtain funds to pay off the promissory notes, Dolphin established a line of credit from Dolphin Mortgage Co., a related entity. That line of credit was secured by Delaney's, Botti's, and von Emster's personal residences. Dolphin Mortgage went out of business in 1987, and the loan was "rolled over" to another entity, Investek Financial Corp., which loaned Dolphin additional money to operate parks other than Vista. Investek obtained another promissory note from Delaney and Botti, which was secured by their residences.

In December 1988, plaintiffs terminated Dolphin as manager of Vista. Defendants subsequently demanded that Botti contribute to paying that portion of the Investek loan corresponding to repayment of the Vista-related loan, but Botti refused.

On July 1, 1994, plaintiffs brought this action, seeking, *inter alia*, to quiet title in Vista against potential adverse claims by defendants.[3] On October 21, 1994, defendants answered, asserting affirmative defenses and counterclaims against all plaintiffs collectively, as well as against Botti individually. With respect to all plaintiffs, defendants asserted counterclaims for fraud, imposition of equitable lien, breach of contract, money had and received, and unjust enrichment. The latter three counterclaims represented alternative theories of recovery for the same damages—*i.e.*, each sought damages in the amount of the Vista-related loans, as well as pre-judgment interest on those amounts, and additional damages for unpaid management fees. In addition, defendants alleged

[3] The record is unclear as to what transpired between the parties between 1988 and 1994 and, particularly, what precipitated the filing of this action.

an entitlement to contractual "prevailing party" attorney fees under the promissory notes and deed of trust.

With respect to Botti individually, defendants asserted counterclaims for indemnity, contribution, money had and received, breach of fiduciary duty, negligent misrepresentation, and declaratory relief. Each of those counterclaims arose from Botti's alleged personal liability on the Vista-related portion of the Investek loan. Plaintiffs replied to all counterclaims, asserting various affirmative defenses, including statute of limitations, laches, and lack of authority to contract.

After plaintiffs successfully moved for summary judgment on their quiet title claim, defendants' counterclaims were tried to the court. Applying Oregon law to all counterclaims, the trial court entered judgment for defendants against all plaintiffs on the counterclaims for imposition of an equitable lien, breach of contract, money had and received, and unjust enrichment.[4] On each of the latter three counterclaims, the court separately awarded damages of $95,633.49, representing the total of the Vista-related loans from third-party parks ($73,000), Dolphin's direct loan to Vista ($7,500), and unpaid management fees assessed at a rate of six percent of Vista's gross monthly income ($15,133.49).[5] In addition, the court awarded prejudgment interest on each of the Vista-related loans, at the rate specified in the note, with interest running from the date of the execution of each note. The court also awarded defendants attorney fees of $77,143.18 pursuant to the fee provisions of the promissory notes and of the June 1982 deed of trust.

With respect to Botti, the court entered judgment for Dolphin against Botti on defendants' contribution counterclaim, awarding damages of $45,375, representing half of the balance of the Investek loan, which was attributable to payments on Vista's behalf. The court entered judgment for Botti on the remaining counterclaims.

■   Plaintiffs appeal, raising eleven assignments of error. In their first assignment, plaintiffs argue that the trial

---

[4] The court entered judgment for plaintiffs on defendants' fraud counterclaim.

[5] Thus, the damages awarded on each of those claims are duplicative.

court erred in applying Oregon, rather than California, law to each counterclaim. Plaintiffs assert that California law should control because all parties are California residents or corporations, all contracts were executed in California, and all loans were made in California and to be repaid in California. In rejecting that argument, the trial court observed:

"[t]he interests and policies of Oregon are at stake because (1) the plaintiffs, who own the Oregon land, selected the Oregon forum; (2) the plaintiffs borrowed money that was used in the operation of the land, a mobile home park in Oregon; and (3) the plaintiffs intended that the debts would be secured through an interest in the Oregon land. Oregon has a significant stake in controlling the enforceability of security interests in Oregon land and the underlying debts that arose out of the ownership of that land."

On appeal, plaintiffs again emphasize the parties' and the transactions' California contacts. That emphasis, however, ignores a vital threshold issue: "Contacts" notwithstanding, Oregon courts *first* look to whether there is a material difference between Oregon substantive law and the law of the other forum. If there is no material difference—if there is a "false conflict"—Oregon law applies. *See, e.g., Erwin v. Thomas*, 264 Or 454, 457-62, 506 P2d 494 (1973); *Manz v. Continental American Life Ins. Co.*, 117 Or App 78, 81-82, 843 P2d 480 (1992), *modified* 119 Or App 31, 849 P2d 549 (1993). Thus, it was incumbent on plaintiffs, as the proponents of California law, to identify material differences in the applicable substantive law of Oregon and California.

■ Plaintiffs have failed in that obligation. Although they do identify a single difference in the two states' laws—*viz.*, California has shorter statutes of limitations for claims of breach of contract and money had and received—that difference is immaterial because, as described below, defendants' breach of contract and money had and received counterclaims are time-barred regardless of which state's limitations periods control. Plaintiffs have identified no other differences in the law of the two states, and it is not our obligation to cast around the law of California in quest of possible material differences. Because plaintiffs have not demonstrated any material distinctions between the Oregon and

California substantive law, pertaining to defendants' counterclaims, the trial court did not err in applying Oregon law.

In their second assignment of error, plaintiffs contend that, to the extent defendants' counterclaim for breach of contract sought, and recovered, damages based on the promissory notes,[6] such recovery was barred by the statute of limitations. The trial court found that the "statute of limitations did not begin to run on any of defendants' counterclaims until the filing of this lawsuit." Plaintiffs assert, however, that, because the notes were "payable on demand," the statute of limitation on each note began to run on the date it was executed and, because this action was filed more than eight years after the execution of the last note, any contractual recovery is, necessarily, time-barred.[7]

Defendants respond that, although the notes were payable on demand, no demand was made until this lawsuit was filed. Thus, they reason, the limitation period did not begin to run until this action commenced. Alternatively, defendants argue that plaintiffs are estopped from asserting the statute of limitations because they affirmatively induced defendants not to bring suit before the statute ran by continually acknowledging and ratifying the debts owed.

As this case was presented to the trial court and as it has been treated on appeal, plaintiffs are correct. The statute

---

[6] As noted, in their breach of contract counterclaim, defendants sought not only to recover damages in the principal amount of the promissory note but also sought, and successfully obtained, prejudgment interest based on the rates specified in the various notes, as well as attorney fees based on the notes.

Plaintiffs' statute of limitations arguments are directed solely against that component of the contractual counterclaim. They do not assert that defendants' recovery on the remaining component of the breach of contract counterclaim—recovery of unpaid management fees—was time-barred.

[7] As noted, plaintiffs brought this action on July 1, 1994, and defendants asserted their counterclaims on October 21, 1994. Although in this case the difference in time between commencement of the action and the initial pleading of the counterclaims is immaterial for limitations purposes—more than six years had elapsed between accrual and either of those dates—the date of the filing of the action is, in this case, the proper benchmark for measuring the timeliness of the counterclaims; *See Lewis v. Merrill*, 228 Or 541, 549, 365 P2d 1052 (1961) ("[W]here a counterclaim arises out of the transaction alleged in the complaint and is in existence at the time that the complaint is filed and is not then barred by a statute of limitations, it will not be barred by the running of the statutory time thereafter, but the statute will be suspended until the counterclaim is filed.")

of limitations for contract claims is six years. ORS 12.080(1). In *Estate of Culver v. Andres*, 26 Or App 809, 811, 554 P2d 541 (1976), we adopted the general view "that a promissory note payable 'on demand' is due immediately without an actual demand, and the statute of limitations commences to run against the note from the date of its execution and delivery and not from the date of demand." Defendants acknowledge or, at least, do not dispute that all notes underlying their breach of contract counterclaim were demand notes. The last of those notes was executed in August 1985. This action was filed in July 1994, more than eight years later and, is thus, time-barred.[8]

■ Defendants assert, however, that, even if the promissory note component of their contractual counterclaim would otherwise be time-barred, plaintiffs should be equitably estopped from invoking the statute of limitations because they continually affirmed their indebtedness to Dolphin. However, defendants failed to plead the elements of equitable estoppel, *see Gehrke v. CrafCo, Inc.*, 143 Or App 517, 525-26, 923 P2d 1333 (1996), *rev den* 324 Or 560 (1997), and, in all events, did not argue to the trial court that plaintiffs were precluded from raising a limitations defense. Consequently, the trial court did not render findings that would support a determination that plaintiffs were, in fact, equitably estopped from asserting a limitations defense. Because the matter is raised for the first time on appeal, we decline to consider it. *See State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988).

---

[8] We note that ORS 73.0118(2) provides:

"* * * if demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of 10 years."

That provision was enacted in 1993, after causes of action based on the notes here were barred under the then-extant rule announced in *Estate of Culver*. 26 Or App at 811. *See* Or Laws 1993, ch 545, § 21. Here, defendants have not invoked ORS 73.0118 or addressed whether the notes underlying this dispute are subject to the Uniform Commercial Code generally or the proper relationship between the subsequently enacted ORS 73.0118 and causes of action extinguished under the prior limitations rule. Accordingly, we do not consider the application, if any, of ORS 73.0118.

We thus conclude that, to the extent the contractual counterclaim sought damages in the principal amount of the promissory notes and prejudgment interest on those notes, such recovery was time-barred. The trial court erred in entering judgment for such damages[9] and, on remand, the judgment on the breach of contract counterclaim must be modified to include only damages for unpaid management fees.[10]

In their third assignment of error, plaintiffs contend that defendants' counterclaim for money had and received was time-barred to the extent that it was premised on the Vista-related loans. Plaintiffs argue, particularly, that that claim accrued when the money was "received," which, they argue, was at the time that Dolphin originally procured the Vista-related loans. Plaintiffs assert that, because the six-year statute of limitations for implied contract claims applies and because the last loan was made in 1985, the claim is time-barred.

■■     We agree that the counterclaim for money had and received is time-barred, albeit for somewhat different reasons than plaintiffs posit. Money had and received "is an action at law but is governed by equitable principles." *Belmont Int'l, Inc. v. American Int'l Shoe Co.*, 313 Or 112, 123, 831 P2d 15 (1992). The six-year statute of limitations for implied contract claims, ORS 12.080(1), governs. *Albino v. Albino*, 279 Or 537, 553-54, 568 P2d 1344 (1977). Although there is no Oregon case on point, it is generally accepted that a claim for money had and received accrues, and the statute of limitations begins to run, when the party against whom the claim is asserted receives payment. *See* 54 CJS, *Limitations of Actions* § 158 ("Generally, where a person is obliged to pay money for which another is liable, or pays it at the other's request, his right of action to recover it from the latter accrues, and the statute of limitations runs, from the time of payment.").

---

[9] Given that disposition, we need not address plaintiffs' fifth assignment of error, in which plaintiffs assert that they could not be liable for breach of contract under the terms of the notes because Dolphin was not entitled to enforce them.

[10] As discussed below, with reference to plaintiffs' seventh assignment of error, we conclude that the trial court erred in its determination of the recoverable amount of unpaid management fees. 156 Or App at 306-07.

Here, plaintiffs never physically received payment, but they did receive the benefit of payment. That is, they received the benefit of Dolphin's payments on the Vista-related loans as the lending mobile home parks were sold. *See generally Davis v. Tyee Indus., Inc.*, 58 Or App 292, 296, 648 P2d 388 (1982), *aff'd* 295 Or 467, 668 P2d 1186 (1983) ("It is not necessary that the defendant have received money from the plaintiff to enable the action to be maintained"); 42 CJS, *Implied Contracts* § 17 (1991) ("It is not necessary * * * to prove that money belonging to plaintiff was actually and physically given to, and received by, defendant * * * and it is sufficient if defendant has received the benefit indirectly."). Consequently, plaintiffs "received payment" from Dolphin, triggering the six-year limitations period, as Dolphin paid off the Vista-related loans. Each of those third-party loans was paid off no later than January 12, 1988, more than six years before the commencement of this action. Thus, recovery based on the payment of those third-party loans was time-barred.[11]

■ With respect to the one loan that Dolphin itself made directly to Vista in August 1985, the cause of action for money had and received accrued when Vista received the benefit of that loan. There appears to be no dispute that those monies were applied to fund Vista's operations and that the funds were expended shortly after they were advanced. Consequently, just as the money had and received counterclaim was untimely as to the third-party loans, it was also untimely as to the August 1985 Dolphin/Vista loan. Thus, the trial court erred in awarding defendants damages on the money had and received counterclaim in the principal amount of the promissory notes. On remand, the judgment on that counterclaim must be modified to include damages only for unpaid management fees.

---

[11] *Cf.* ORS 73.0118(7)(a):

"Unless governed by other law regarding claims for indemnity or contribution, an action for any of the following must be commenced within six years after the claim for relief accrues:

"Conversion of an instrument, for money had and received, or like action based on conversion."

For the reasons previously stated, 156 Or App at 302 n 8, we do not address the application of that provision.

Plaintiffs' fourth assignment of error challenges the trial court's ruling that defendants' counterclaim for unjust enrichment was not barred by laches. Plaintiffs' argument parallels their limitations argument with respect to money had and received—*i.e.*, that the claim accrued upon "enrichment"; that any enrichment occurred when the original loans were advanced; and that the statute of limitations for the analogous claim at law had expired before the action commenced.

Defendants respond that plaintiffs were not "enriched"—and, thus, that the cause of action did not accrue—until Dolphin paid off the Vista-related loans from other mobile home parks. In all events, defendants emphasize, the trial court found that plaintiffs were not prejudiced as the result of the passage of time and, thus, laches does not apply.

■ ■     Defendants are correct. Unjust enrichment is an equitable claim subject to the defense of laches. *Mattson v. Commercial Credit Bus. Loans, Inc.*, 301 Or 407, 419-20, 723 P2d 996 (1986). To prevail on their laches defense, plaintiffs must prove:

> "(1)   [Defendants] delayed asserting their claim for an unreasonable length of time, (2) with full knowledge of all relevant facts (and laches does not start to run until such knowledge is shown to exist), (3) resulting in such substantial prejudice to [plaintiffs] that it would be inequitable for the court to grant relief." *Id.* at 419.

If, however, the statute of limitations period for the analogous action at law has run at the time the suit is filed, the burden shifts to defendants to prove the absence of laches. *See Fontana v. Steenson*, 145 Or App 229, 232, 929 P2d 336 (1996). In that event, there is a rebuttable presumption that laches has been proven. *Id.*

The most closely analogous claim at law to unjust enrichment is money had and received. As noted, the statute of limitations for that claim is six years. 156 Or App at 304. Because more than six years had passed since the payment of the loans, the burden was on defendants to prove the absence of laches.

■ Defendants met that burden. The trial court found that "laches does not bar Dolphin's equitable claims because they were brought promptly and *there has been no prejudice to plaintiffs*." (Emphasis added.) We review that determination on an equitable issue *de novo* and, without further comment, concur in the trial court's view. Accordingly, laches did not preclude the unjust enrichment counterclaim.

■ In their sixth assignment, plaintiffs assert that the trial court erred in ruling that they could be liable, under any of the alternative theories, for the originally unauthorized November 1, 1981, loan.[12] Plaintiffs assert that defendants were not authorized to enter into that transaction, and the trial court agreed. However, the trial court further found, and we agree, that plaintiffs later ratified defendants' conduct and the consequent obligation. That ratification is conclusive. *See Southern Oregon Production Credit Ass'n. v. Patridge,* 71 Or App 53, 55, 691 P2d 135 (1984) ("To hold a purported principal liable by ratification of an unauthorized act of an agent, the principal must have knowledge of the material facts and an intent, express or implied, to ratify.").

Plaintiffs' seventh assignment of error asserts that the trial court erred in awarding defendants management fees based on a rate of six percent of gross monthly income generated by the property, rather than two percent of gross annual income. Plaintiffs point to the parties' "Tenancy-in-Common Agreement," which provides:

"[A]ll management duties related to the operation of the Common Property shall be discharged by Dolphin Real Estate * * *. Said Managing Agent shall be entitled to compensation equal to two percent (2%) per annum of the gross income produced by the Common Property as payment for the management services to be rendered by it during the term of this Agreement."

Defendants counter that the trial court's endorsement of the six percent figure was correct as being derived

---

[12] Given our disposition of the second and third assignments of error—*i.e.*, that any recovery in contract or for money had and received based on the Vista-related notes was time-barred—our discussion of this assignment of error is, necessarily, limited to whether defendants' unjust enrichment counterclaim could include recovery based on the November 1, 1981, loan.

from references in a prospectus for Vista that Dolphin generated. For most of its tenure, Dolphin did, in fact, charge a six percent fee, and plaintiffs, with perhaps one exception, did not object to that rate.

■■ The Tenancy-in-Common Agreement is, in fact, the only written agreement executed by the parties governing Dolphin's management of Vista. That agreement unambiguously provides for a two percent management fee. "Unambiguous contracts must be enforced according to their terms[.]" *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347, 876 P2d 761 (1994). Representations in the prospectus, which antedated the execution of the Tenancy-in-Common Agreement, and which are arguably contrary to terms of that agreement, could not alter the unambiguous terms of the subsequent writing. Nor did the parties' subsequent, arguably inconsistent, conduct afford the basis for assessing a six percent fee. *Id.*; *Goodman v. Continental Cas. Co.*, 141 Or App 379, 389, 918 P2d 438, *rev den* 324 Or 305 (1996) ("[C]ourts can resort to such extrinsic evidence [of parties' subsequent conduct in performing contract] in construing contracts only if contractual language is ambiguous.").

Here, defendants did not counterclaim for reformation of the contract based upon mutual mistake, *see, e.g., Klamath County 9-1-1 v. Dept. of State Police*, 116 Or App 123, 125, 840 P2d 751 (1992), or argue that the parties, by subsequent oral agreement, had modified the two percent figure. Nor did defendants assert that plaintiffs were somehow estopped from invoking the two percent figure. The trial court thus erred in awarding defendants unpaid management fees of six percent, rather than two percent, of gross income.

Plaintiffs' eighth assignment of error challenges the trial court's entry of judgment for Delaney, as well as for Dolphin, on the counterclaims. Plaintiffs argue that Delaney is not entitled to be a judgment creditor because there was no evidence that Delaney personally paid any monies to Vista or satisfied any obligations that benefitted Vista.

■ We agree. Delaney did not personally advance any funds to Vista. Nor did he personally pay off any portion of the Vista-related loans from other parks or any portion of the

Investek loan corresponding to such payment. The trial court erred in naming Delaney as a judgment creditor.

■ Plaintiffs' ninth assignment of error challenges the trial court's determination that Botti is liable to Dolphin on its contribution claim pertaining to repayment of Investek loan. In imposing that liability, the trial court rendered the following findings and conclusions:

> "For Dolphin to make repayment of Vista's loans from the other mobile home parks, Dolphin obtained a line of credit from Dolphin Mortgage, secured by Delaney's, Botti's and Konrad von Emster's personal residences. In 1987, when Dolphin Mortgage was going out of business, Investek Financial Corporation ('Investek') took over the loan Dolphin had obtained from Dolphin Mortgage for the Vista debts, along with other loans received from Dolphin Mortgage. Investek paid off Dolphin Mortgage, including the loan Dolphin had obtained to pay Vista's debts to the other mobile home parks. The principals of Dolphin, Delaney and Botti, signed a promissory note for Investek's loan to Dolphin. The Investek promissory note was guaranteed by Delaney's and Botti's personal residences.

> "* * * Botti is jointly and severally liable with Delaney for the payment of the amount on the Investek loan which is attributable to Vista. The evidence showed that the current balance on the Investek loan is $90,750, all of which is attributable to payments on behalf of Vista. The court finds that Dolphin has not been reimbursed by Botti for any amounts that it has paid, despite demands. Botti is indebted to Dolphin for one-half (½) of the amount of the Investek loan attributable to Vista."

Plaintiffs argue that the trial court erred in its "joint and several" liability conclusion because: (1) The Investek loan was obtained solely for *Dolphin's* benefit; (2) to the extent that Botti and Delaney both executed a promissory note and pledged their homes as security for the Investek loan, they were "at best * * * joint guarantors of the loan"; (3) Dolphin did, in fact, make all payments against the Investek loan; (4) Delaney, the other supposed joint and several obligors, never made any payments on the Investek loan; and (5) if Dolphin is permitted to recover judgment against Botti,

that judgment would effect an impermissible double recovery:

> "If the proceeds from the Investek loan were in fact used to pay the loans from the other parks, then there is no more outstanding indebtedness to the owners of the other parks; the only remaining indebtedness would be for the Investek loan. The defendants will obtain a double recovery if all plaintiffs, including plaintiff Botti are held liable on the original promissory notes and then plaintiff Botti is additionally held liable for contribution on the Investek loan, which loan proceeds were presumably used to pay the holder of the promissory notes."

Without necessarily endorsing every particular of plaintiffs' argument, we conclude that the court erred in entering judgment for contribution against Botti. We note, particularly, that Dolphin was, in fact, the sole beneficiary of the Investek loan—all proceeds from that loan were applied to meet Dolphin's obligations—and that Dolphin is, in effect, seeking contribution from a guarantor of its own primary obligation. In those circumstances, Dolphin is not entitled to contribution.

Plaintiffs' tenth assignment of error asserts that the trial court erred in awarding defendants attorney fees "pursuant to the terms of the promissory notes [and] the trust deed." Given our conclusion that any recovery based upon the promissory notes—and, by implication, the trust deed—was time-barred, *see* 156 Or App at 301-02, the supplemental judgment for attorney fees must be reversed.

Plaintiffs' eleventh, and final, assignment of error challenges the trial court's award of deposition costs to defendants. Plaintiffs assert, and defendants acknowledge, that deposition costs were awarded based upon language in the trust deed which, in turn, implicated the promissory notes. Because, as described above, defendants could not prevail on that basis, they are not entitled to recover their deposition costs. *See generally* ORCP 68 A(2) ("The expense of taking depositions shall not be allowed * * * except as otherwise provided by rule or statute.").

Judgment for defendant Delaney on defendants' third (breach of contract), fourth (money had and received)

and fifth (unjust enrichment) counterclaims reversed; judgment for defendant Dolphin on defendants' third and fourth counterclaims reversed and remanded with instructions to award damages only for unpaid management fees, calculated on the basis of two percent of annual gross income; judgment for defendant Dolphin on defendants' fifth counterclaim reversed and remanded with instructions to modify award of damages so that unpaid management fees are calculated on the basis of two percent of annual gross income; supplemental judgment awarding defendants attorney fees and deposition costs reversed; otherwise affirmed.