DeVORE, P. J.
*733 *36 This dispute involves a family's conflicting claims to a parcel of property. Defendant appeals a general judgment entered after the trial court granted plaintiff's motion for summary judgment on plaintiff's claims for quiet title and for injunctive relief. The court also granted summary judgment for plaintiff against defendant's counterclaims for breach of contract, fraud, unjust enrichment, quantum meruit , and quiet title. Among other things, defendant argues that the trial court erred because there are genuine issues of material fact on the claims and counterclaims. We agree only in part. We affirm the judgment granting plaintiff's claim to quiet title and dismissal of defendant's counterclaims for fraud, breach of contract, and quiet title; but, due to disputed facts, we reverse the judgment as to dismissal of defendant's counterclaims for unjust enrichment and quantum meruit ; and we reverse and remand the judgment granting plaintiff's claim for injunctive relief.
Plaintiff is the Hoag Living Trust (the "Trust"). James F. Hoag ("Jim") and Muriel Hoag ("Muriel") are husband and wife and are settlors of the Trust. They have two children, Patti Hoag ("Patti") and J. Jay Hoag ("Jay"). Jim, Muriel, and Patti are trustees of the Trust. Jim's mother and Jay's grandmother is Bonnie Sproul ("Bonnie"). Jay is the defendant.
Several adjacent tax lots, Lot 2500, Lot 2404, and Lot 2401, have been owned by Hoag family members or their trusts for many years. In about 1983, defendant's grandmother Bonnie purchased Lot 2500. Shortly after she purchased the lot, Jay signed an agreement to pay monthly rent, and he moved onto Lot 2500. In 2006, Bonnie conveyed her interest in the lot to Jay with a right of survivorship, and, in 2009, she died.
In the meantime, Jim and Muriel had held title to Lot 2404. In 2013, they conveyed Lot 2404 to the Trust as part of their estate plan. Lot 2404 is the locus of this dispute. Jay acknowledged that the Trust holds title, but he claims a right to Lot 2404, based on an oral agreement that he alleges he reached with Jim, Muriel, and Bonnie over 30 years ago. Jay claims that, under an unwritten family *37 plan, Lots 2500, 2404, and 2401 would be conveyed to him "if he made payments towards the expenses of those lots and maintained and improved them."
In 1992, however, Jim and Muriel sold Lot 2401 (the "Eastern Property") to third parties in order that Jim could pay a judgment debt. Jay objected, believing the sale to be contrary to the oral agreement.
Around 2006, Jim and Muriel listed Lot 2404 for sale, and they found a prospective buyer, but the sale did not close, because Lot 2404 was not zoned for building a residence on the property. As a consequence, Jim and Muriel filed a Measure 37/49 claim.[1] Jim and Muriel signed the claim paperwork, which identified them, but not Jay, as the titled owners of the property.
Lot 2404 is landlocked. It is bordered by a creek to the east, steep cliffs to the north, property owned by third parties to the south, and Jay's Lot 2500 to the west. Jay describes Lot 2404 as an eight-acre parcel that is a "park" that he has maintained for 30 years.[2] He recounts that he has mowed the property, removed branches and fallen trees, done road maintenance, and kept drainage ditches clear. He says that he has dug holes for septic systems, constructed drainage systems, devised a system for fish passage in the creek, and built a bridge over the creek. Jay says that he made payments to his grandmother Bonnie and his father Jim for taxes and insurance on both Lots 2500 and 2404. Jay says that his parents made repeated representations to him, as recently as 2012, that he would receive Lot 2404 under the family succession plan.
Access to Lot 2404 is accomplished on a road on an easement over Lot 2500-an easement that Jim and Muriel had been granted in 1989. In March 2013, Jim used the road, *734 removed Jay's gate, and installed another gate. In the process, Jim and Jay engaged in a heated confrontation. *38 In May 2013, the Trust filed a complaint to quiet title to Lot 2404 and to secure an injunction preventing Jay from interfering with the easement. Jay denied most of the Trust's allegations, alleged affirmative defenses, and asserted counterclaims for breach of contract, fraud, unjust enrichment, quantum meruit , and quiet title. Jay alleged that he is entitled to own Lot 2404 based on the alleged oral agreement he made over 30 years ago with Jim, Muriel, and Bonnie. Jay alleged that Jim, Muriel, and Bonnie had agreed that he could "reside on Lot 2500 and that Lots 2404 and 2500 would later be conveyed to him if he made payments towards the expenses of those lots and maintained and improved them." Jay alleged that, in reliance on that agreement, he moved onto Lot 2500 about 30 years ago and thereafter made payments toward mortgage, taxes, and other expenses of Lots 2404 and 2500. Alternatively, Jay alleged that the Trust has been unjustly enriched because it had received, but had not compensated or repaid him for, among other things, money, labor, and equipment that Jay had provided to the Trust for Lot 2404. The Trust replied, asserting laches, the statute of limitations, and the statute of frauds, among other defenses.
The Trust moved for summary judgment on all claims and counterclaims, supported by declarations, exhibits, Jay's deposition, and the deed showing that the Trust holds recorded title to Lot 2404. Among other things, the Trust argued that the statute of frauds and statute of limitations barred Jay's claims that depended on the alleged oral agreement.
Jay opposed the Trust's motion for summary judgment. Jay submitted declarations and exhibits showing, among other things, that he had paid for property-related expenses, such as taxes, insurance, and equipment, related to Lot 2404. Taken together, Jay argued that the evidence created a genuine issue of material fact on all of the claims and counterclaims. In addition, Jay moved, pursuant to ORCP 47 F, to continue the summary judgment hearing until later so that he could conduct further discovery.
The trial court denied Jay's motion for continuance and granted the Trust's motion for summary judgment on *39 its claims and Jay's counterclaims. On the Trust's first claim seeking quiet title, the court concluded that the Trust was the owner in fee simple of Lot 2404 and entitled to possession of the property. On the Trust's second claim, the court concluded that the Trust was entitled to a permanent injunction barring Jay from interfering with the Trust's easement. Lastly, the court concluded that Jay's counterclaims were based on an unwritten agreement for the transfer of land and were barred by the statute of frauds.
Jay raises three assignments of error on appeal. First, he argues that the court erred in granting the Trust's motion for summary judgment. Second, he argues the court abused its discretion in denying his continuance motion. Third, he argues that the court erred in granting the preliminary and permanent injunctions. We reject without discussion Jay's second assignment of error regarding a continuance. We discuss the assorted issues posed by his first assignment of error. We conclude that the statute of frauds warrants quieting title in favor of the Trust and rejecting Jay's counterclaim for breach of contract. We conclude, however, that the statute of frauds does not bar Jay's quasi-contract counterclaims; and that, as far as can be determined on summary judgment, the doctrine of laches and the statute of limitations do not bar Jay's counterclaims for unjust enrichment and quantum meruit . We conclude that Jay's counterclaim for fraud in the inducement fails as a matter of law on its merits. Finally, as to the third assignment, we conclude that questions of fact preclude summary judgment on the Trust's claim for injunctive relief.
Because this case comes to us on summary judgment, we review the evidence and all reasonable inferences in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact and whether the Trust is entitled to judgment as a matter of law. ORCP 47 C; Jones v. General Motors Corp. , 325 Or. 404, 420, 939 P.2d 608 (1997).
*735 As to part of Jay's first assignment, we agree with the trial court that the statute of frauds justified summary judgment in the Trust's favor on the conflicting claims to quiet title and against Jay's breach of contract counterclaim.
*40 See ORS 41.580(1)(e) (statute of frauds); ORS 93.020(1) (writing required). Jay admits that there was no writing that set forth the family plan, but he asserts part performance of the plan, and he points to an undated letter from Bonnie, which he says "confirms [his] role in the family plan." We find his arguments unpersuasive.
As for the letter, it does not purport to express the terms, let alone the entirety, of the family plan, and, even if it had done so, the property description is inadequate. Bonnie's letter refers to "the Hatton Road Property" and says "I'm giving you the property" to more than make up for working at minimum wage in the jewelry store. Bonnie did give Jay Lot 2500, and it had a Hatton Road address. The disputed Lot 2404 also bordered on Hatton Road, but Jay's declaration says that the family considered Lot 2404 and 2401 as "Wilsada Park." On appeal, the parties dispute whether the letter could be interpreted to refer to Lot 2404, because they dispute whether Bonnie had ever actually received title to the property. That dispute is immaterial, however, because, on its face, the property description in the letter is too ambiguous.
In High v. Davis , 283 Or. 315, 326, 584 P.2d 725 (1978), the Supreme Court reviewed cases and explained:
"To summarize, if it is clear from the face of the writing that the description could apply with equal accuracy to more than one piece of property, it is unenforceable by reason of that fact. If the written description might possibly apply to but one piece of land, evidence is admissible to determine whether there is only one, or more than one, to which it might apply. If it can be determined with reasonable certainty that there is only one, the written description is sufficiently definite to meet the requirements of the statute of frauds although the complete description must be supplied from other sources. If, however, the extrinsic evidence demonstrates that there is more than one piece of property to which the description in the writing can accurately apply the description is ambiguous and the writing will be held insufficient."
When an ambiguity in the writing cannot be cured without resort to parol evidence of the parties' intentions, the writing is unenforceable. Id. at 326-27, 584 P.2d 725. Here, Jay must rely *41 on his testimony about the plan in general and Lot 2404 in particular, and, due to the statute of frauds, he cannot. Id. Thus, given the uncertainty of the meaning of the "Hatton Road property," Bonnie's letter does not save Jay's claims from the statute of frauds.
Ambiguity is also the problem with Jay's reliance on part performance. A party who relies on partial performance must show, "[1] the existence of an agreement that is clear and unambiguous in its terms , [2] that the partial performance unequivocally and exclusively refers to the agreement, and [3] that there are equitable grounds for enforcing the agreement." Burgdorf v. Weston , 259 Or. App. 755, 758, 316 P.3d 303 (2013), rev. den. , 355 Or. 380, 328 P.3d 696 (2014) (emphases added).
Jay concedes that the family plan kept changing, as reflected by his parents' sale of the Eastern Property. The parties allegedly "performed," in that Jay's sister received the family jewelry store, Bonnie conveyed Lot 2500 to Jay, and Jay made payments or performed labor, but, even at that, doing so did not clearly and unambiguously show the terms of the agreement nor unequivocally and exclusively refer to the terms of the agreement. Instead, Jim and Muriel's sale of the Eastern Property and their acts indicating their exclusive retention of Lot 2404 create uncertainty about the family plan. Because the family's acts do not confirm the terms of a plan to convey Lot 2404 to Jay, part performance does not satisfy the statute of frauds.
We next address dismissal of Jay's counterclaims for quantum meruit and unjust enrichment. He argues that the statute of frauds does not apply to those claims and that, contrary to the Trust's alternate argument, the statute of limitations has not expired. We take those legal issues in turn.
*736 On appeal, the Trust does not argue that the statute of frauds bars Jay's quasi-contract counterclaims. That silence is conspicuous, because the statute of frauds may have been the trial court's reason for dismissal of those claims. The trial court determined that "[d]efendant's claims are based on an unwritten, unenforceable contract regarding the transfer of land, and are thus barred by the statute of *42 frauds." That explanation certainly pertains to Jay's contract and quiet title counterclaims, but, to the extent that the explanation may pertain to other claims, that explanation fails to appreciate that Jay's quasi-contract claims pre-suppose forms of an implied-in-law contract.
By their nature, the quasi-contract claims of unjust enrichment and quantum meruit may survive even if the statute of frauds bars the enforcement of a contract covering the same events alleged in the complaint. See Kashmir v. Patterson , 43 Or. App. 45, 48, 602 P.2d 294 (1979), aff'd , 289 Or. 589, 616 P.2d 468 (1980) ("Such alternative pleading may be beneficial to the pleader in the situation where it is faced with a contract which may be void under the statute of frauds * * *."). As asserted in this case, unjust enrichment and quantum meruit are "forms of restitution" where the pleader has performed services for the other party "and seeks to recover their fair value." Id . at 47, 602 P.2d 294. Such claims "pre-suppose[ ] that no enforceable contract exists." Id . at 48, 602 P.2d 294. In short, the trial court erred in concluding that the statute of frauds barred defendant's counterclaims for quantum meruit and unjust enrichment based on payments and labor Jay allegedly invested into Lot 2404 and a series of promises by Jim and Muriel that they would ultimately convey Lot 2404 to Jay.
The issues involving the statute of limitations-or, as we explain, the doctrine of laches-are more nuanced.[3] The Trust simply argues that the six-year statute of limitations applies because Jay's unjust enrichment and quantum meruit claims are based on an implied contract, and an implied contract is subject to the six-year limitation period by ORS 12.080(1).[4] The Trust contends that the statute of limitations bars the counterclaims because any long-standing agreement was breached years ago. The Trust asserts that the statute of limitations began to run at the occurrence of *43 any one of the following events: (1) in 1992, when Jim and Muriel sold the Eastern Property; (2) in 2006, when Jim and Muriel listed Lot 2404 for sale without Jay's participation; or, (3) in 2006, when Jim and Muriel omitted Jay from their Measure 37/49 claim. In the Trust's view, each of those events was inconsistent with what Jay had asserted was the parties' oral agreement, such that the claims accrued too long ago.
Jay contends that he made payments to Jim, Muriel, and Bonnie for taxes, insurance, and other expenses associated with Lot 2404-not just for Lot 2500. Jay contends that, although Lot 2500 was conveyed to him in 2006, he continued to make payments to Jim, Muriel, or Bonnie for Lot 2404 until 2011. Among other things, Jay relies on his deposition testimony and on checks that show his payments to Jim for "property tax" in 2011 and payments to Bonnie reflecting payments for "house," "taxes," and related expenses over the course of many years. Jay also relies on his declaration showing repeated and relatively recent promises by Jim and Muriel that Jay would ultimately be conveyed Lot 2404.
Jay argues that the statute of limitations on his counterclaims for unjust enrichment and quantum meruit started to run only when the Trust filed its complaint against him demonstrating the Trust's "clear intention to completely divest defendant of any rights in the property and to not reimburse him for any of the monies or labor he has invested into the property." Jay appears to argue that a "discovery rule" applies to his unjust enrichment and quantum meruit *737 counterclaims. Jay concludes that a genuine issue of material fact precludes summary judgment. Although our reasons are somewhat different, we agree that Jay has the better view of when his quasi-contract claims accrued.
More correctly framed, a claim of unjust enrichment is "an equitable claim subject to the defense of laches." Angelini v. Delaney , 156 Or. App. 293, 305, 966 P.2d 223 (1998), rev. den. , 328 Or. 594, 987 P.2d 514 (1999). In order to prevail on a laches defense, the Trust must prove:
"(1) [the claimant] delayed asserting [his] claim for an unreasonable length of time, (2) with full knowledge of all relevant facts (and laches does not start to run until such *44 knowledge is shown to exist), (3) resulting in such substantial prejudice to [the other party] that it would be inequitable for the court to grant relief."
Mattson v. Commercial Credit Business Loans , 301 Or. 407, 419, 723 P.2d 996 (1986). If, however, the limitation period for the analogous action at law has run at the time the suit is filed, the burden shifts to the claimant, Jay, to prove the absence of laches. See Angelini , 156 Or. App. at 305, 966 P.2d 223 ; see also Fontana v. Steenson , 145 Or. App. 229, 232, 929 P.2d 336 (1996). In that situation, there is a "rebuttable presumption that laches has been proven." Angelini , 156 Or. App. at 305, 966 P.2d 223.
To determine the limitation period related to Jay's equitable counterclaims, we look to the "most closely analogous claim at law." Id . Under ORS 12.080(1), the statute of limitations for claims based on an express or implied contract is six years.[5] On these facts, the quasi-contract counterclaims are centered on payment of taxes or expenses and rendition of services, and, as a consequence, the six-year limitation period serves as the appropriate reference for such claims of unjust enrichment and quantum meruit . Angelini , 156 Or. App. at 305, 966 P.2d 223 ; but see Htaike v. Sein , 269 Or. App. 284, 294-96, 344 P.3d 527, rev. den. , 357 Or. 595, 358 P.3d 1001 (2015) (applying two-year statute of limitations under ORS 12.110(1) to unjust enrichment claim because the gravamen of the action was grounded in tort).
Whether a matter of laches or limitation, the critical issue is when Jay's quasi-contract claims accrued. It is no surprise that the "accrual of a claim in restitution or unjust enrichment is governed by the same general logic as any other sort of claim: in effect, the claim accrues at the point when the eventual action might first have been brought." Restatement (Third) of Restitution and Unjust Enrichment § 70 comment f (2011); see also CJS Limitation of Actions § 196 (2018) ("The date of accrual on an unjust enrichment claim for purposes of a statute of limitations is the time when the plaintiff could first have maintained his or her action to a successful result.").
*45 To determine when a claimant could have successfully brought his claims, we look to the elements of the claims and the facts of each case. To understand the elements of the claims, we take the approach directed by the Supreme Court in its recent decision in Larisa's Home Care, LLC v. Nichols-Shields , 362 Or. 115, 404 P.3d 912 (2017). The Supreme Court determined that restitution and unjust enrichment claims should be considered on a "case-by-case basis." 362 Or. at 127, 404 P.3d 912. In particular, courts should decide whether "any particular enrichment is unjust by examining whether the case type matches already recognized forms of unjust enrichment." Id. at 128, 404 P.3d 912. In Larisa's Home Care, the Supreme Court rejected the prior, formulaic, three-step approach that this court adopted in Jaqua v. Nike, Inc. , 125 Or. App. 294, 298, 865 P.2d 442 (1993). The Supreme Court concluded that, in "lieu of applying the formula in Jaqua , Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." Larisa's Home Care , 362 Or. at 127, 132, 404 P.3d 912 (unjust enrichment and restitution actions should be addressed "by matching the circumstances presented in the case to those patterns already recognized in the case law").
*738 One source of guidance, on which the Supreme Court relied, is the Restatement (Third) of Restitution and Unjust Enrichment . Id . at 128, 404 P.3d 912. The court observed that the Restatement "contains a statement of four general principles, * * * and then 44 sections addressing the types of circumstances in which liability in restitution is recognized." Id. We consider that guidance to identify Jay's claims and determine when they accrue. Our review of the Restatement yields two recognized circumstances giving rise to quasi-contract claims that parallel Jay's claims.
The first category, entitled "Claimant's Expectation of Ownership," is found in section 27 of the Restatement . There, the Restatement states a general rule:
"If the claimant makes expenditures to maintain, improve, or add value to property that the claimant reasonably expects to retain or to acquire and (because such expectation is frustrated) another person becomes the unintended *46 beneficiary of the claimant's expenditure, the claimant is entitled to restitution from the other as necessary to prevent unjust enrichment."
Restatement § 27 (2011). The comments to section 27 offer illustrations similar to the facts in this case. In them, a person invests money and labor in a property in reliance on representations that she would become owner of the property. See, e.g. , Restatement § 27 comment e, illustrations 11-12.[6]
Another category of quasi-contract is recognized in section 31 of the Restatement . Section 31, entitled "Unenforceability," presents a general rule:
"(1) A person who renders performance under an agreement that cannot be enforced against the recipient by reason of
"(a) indefiniteness, or
"(b) the failure to satisfy an extrinsic requirement of enforceability such as the Statute of Frauds, has a claim in restitution against the recipient as necessary to prevent unjust enrichment. There is no unjust enrichment if the claimant receives the counter performance specified by the parties' unenforceable agreement.
"(2) There is no claim under this section if enforcement of the agreement is barred by the applicable statute of limitations, nor in any other case in which the allowance of restitution would defeat the policy of the law that makes the agreement unenforceable. Restitution is appropriate *47 except to the extent that forfeiture is an intended or acceptable consequence of unenforceability."
Restatement § 31. The comments to section 31 offer illustrations similar to the facts in this case. In them, a claimant alleges an oral contract that is unenforceable under the statute of frauds but asserts a claim for unjust enrichment. See, e.g. , Restatement § 31 comment f, illustrations 8-9.[7]
*739 As suggested by those examples, Jay has alleged actionable circumstances upon which he may bring claims for unjust enrichment and quantum meruit based upon payment of taxes or expenses and rendition of services. That being the case, the question remains: When do those circumstances become actionable? On that issue, the Restatement offers a salient example that suggests an answer:
"7. Agent performs continuous services for Principal during a five-year period. Neither regards Agent's services as gratuitous, but the parties fail through indefiniteness to make an enforceable agreement for compensation. Agent has a claim against Principal for restitution, which on these facts is likely to be styled a claim in quantum meruit. (See § 31, Comment e .) Agent commences his action five years after the last day on which he performed services for Principal. Agent's restitution claim is within the six-year "contracts" provision of the local statute of limitations. Principal argues that Agent's claim is barred insofar as it relates to services provided more than six years prior to the commencement of suit, so that Agent can recover (if at all) only for the last year of work. The argument is plausible, since Principal's enrichment as a result of Agent's services was continuous throughout the course of Agent's *48 employment. Agent responds that-because the parties had no agreement requiring payment on any specific date-Principal was not unjustly enriched until Principal made no payment after Agent's services had been completed. The court adopts the latter view of when the claim accrued, with result that Agent's action for restitution is timely. "
Restatement § 70 comment f, illustration 7 (emphasis added). Like the Restatement authors, we consider the latter view to be persuasive.
In this case, Jay alleged that he was to be given the disputed Lot 2404 when "Bonnie Sproul and/or [his] parents passed away." Bonnie passed away in 2009, but Jay's parents are still living. Jay's payments reportedly occurred as recently as 2011. He declares that he was promised that he would become owner of the lot as recently as 2012. Viewed in the light most favorable to Jay, those facts indicate that Jay's payments and services were ongoing and were not yet completed. The Trust initiated this action in 2013, and Jay brought his counterclaims that same year.
Assuming those facts, the Trust was not unjustly enriched until it initiated this action and, by doing so, demonstrated its intention not to reimburse or compensate Jay for recent and ongoing payments and services he invested into Lot 2404. It follows that Jay's unjust enrichment and quantum meruit counterclaims would not be barred by an analogous six-year statute of limitations. See ORS 12.080(1) (six-year limitation for express or implied contracts). Without more, the Trust has failed to show the first element of laches-that Jay delayed asserting his quasi-contract claims for an unreasonable length of time. See Angelini , 156 Or. App. at 305, 966 P.2d 223. The Trust has not shown that Jay's claims, well within six years of his last payment or services, were unreasonably delayed as a matter of undisputed fact. Therefore, neither the doctrine of laches nor a statute of limitations provides an alternate basis to dismiss Jay's quasi-contract counterclaims on summary judgment.[8]
*49 On the merits, the Trust offers two arguments against Jay's counterclaim for fraud. The Trust argues that the counterclaim was not commenced within the time limited by statute and that, in any event, there is no genuine issue of material fact that, given Jay's admission, the facts cannot comprise a claim for fraud in the inducement as to the family plan. We address only the latter argument because it is dispositive.
The Trust argues that the fraud counterclaim fails because a claim for fraud in the inducement cannot be based upon facts that show only an original agreement and a later decision to breach the agreement. The *740 Trust relies on a case in which the defendants were accused of fraud related to an agreement. In that case, we stated:
"The fact that defendants did not perform their promise does not provide a basis for inferring that they made the promise fraudulently. See, e.g. , Butte Motor Co. v. Strand , 225 Or. 317, 321-22, 358 P.2d 279 (1960) ; Dolph v. Lennon's, Inc. , 109 Or. 336, 350-51, 220 P. 161 (1923) ; The Communications Group, Inc. v. GTE Mobilnet , 127 Or. App. 121, 126, 871 P.2d 502, rev. den. , 319 Or. 406 [879 P.2d 1285] (1994). As those cases demonstrate, the courts have been reluctant to convert a party's exercise of his or her ability to breach a contract (and pay contract damages) into a fraud claim. Some additional evidence is necessary to find that a party entered into the contract with a fraudulent intent. See The Communications Group, Inc. , 127 Or. App. at 126 [871 P.2d 502]."
Olson v. F & D Publishing Co., Inc. , 160 Or. App. 582, 593, 982 P.2d 556 (1999) ; see also Strawn v. Farmers Ins. Co. , 350 Or. 336, 351 n. 11, 258 P.3d 1199, adh'd to on recons , 350 Or. 521, 256 P.3d 100 (2011) (observing that defendant concedes that "fraud will lie for inducing a contract through a promise of future performance if the promise is made with the intent not to perform (so-called 'fraud in the inducement')").
In this case, the issue is determined by what Jay pleaded and how he responded on summary judgment. Because he is the nonmoving party, we construe Jay's pleadings in the light most favorable to him. See Rhodes v. U.S. West Coast Taekwondo Assn., Inc. , 273 Or. App. 670, 672-73, 359 P.3d 1196 (2015), rev. den. , 358 Or. 833, 370 P.3d 504 (2016) (stating rule). As we read it, Jay's answer pleaded a counterclaim for *50 fraud in the inducement in relation to the family plan promised over 30 years before. His fraud counterclaim realleged his allegations from his breach of contract counterclaim. He alleged that Jim, Mural, and Bonnie agreed that he could live on Lot 2500 and would eventually receive Lots 2404 and 2500 in exchange for payment and services. He alleged that, in reliance on those promises, he moved to Lot 2500 about 30 years ago and began making payments and providing services. Jay's fraud allegations added that the representations were false.[9]
When the Trust moved for summary judgment, it asserted that there was no evidence from which a reasonable jury could find that Jim or Murial had a fraudulent intention not to perform a family plan some 30 years before. The Trust relied on a statement in Jay's deposition in which he agreed with a question posed-that, "yes," he believed that "the family plan [was] not fully implemented because Jim changed his mind ." (Emphasis added.) Seizing on that answer, the Trust argues that, because Jay admitted that Jim changed his mind about conveying Lot 2404, Jay concedes that Jim necessarily must have intended, at the time the family plan was alleged to have been made, to perform. The Trust, thus, contends that Jay admitted that Jim did not have fraudulent intent at the time of the original oral agreement-an admission fatal to a claim for fraud in the inducement. See Olson , 160 Or. App. at 593, 982 P.2d 556 (reciting need to prove that a party entered into a contract with a fraudulent intent).
Once the Trust put at issue, in its motion, the question of fraudulent intent at the outset, Jay was required to come forward with contrary evidence sufficient to show a disputed issue of material fact on that element. See ORCP 47 C ("The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial."). In response to the Trust's motion, Jay offered his declaration. He asserted that, consistent with the family plan and his *51 parents' promises to him, he moved into a trailer in the park around 1980, made payments, and, in 1983, moved his family into the house on Lot 2500. Those statements supported his argument about a long-standing family plan, but they did not address the apparent concession that his father had "changed his mind" about carrying through with the plan. In his written argument to the trial court, Jay did not respond to the Trust's reliance on his apparent admission. Instead, Jay noted that Jim's declaration had said *741 nothing about Jim's intentions at the time that he made representations. Jay argued, as his declaration recounted, that Jim had made repeated promises in even recent years.[10]
Even when viewing those facts favorably to Jay on summary judgment, he failed to offer evidence from which to infer that his parents had fraudulent intent at the outset. Jay failed to come forward with evidence to permissibly explain or otherwise contravene his own tacit admission that Jim had simply "changed his mind" about the family plan. On appeal, the Trust again asserted Jay's apparent admission, and again Jay failed to argue in reply or to suggest how he had come forward with evidence to put at issue his parents' fraudulent intent at the time the family plan was devised. On that record, we must accept the Trust's alternate argument that Jay's counterclaim for fraud in the inducement fails on its merits as a matter of law.
Finally, we address the Trust's claim for injunctive relief. The Trust argues that there is no genuine issue of material fact that Jay substantially interfered with the Trust's use of the easement and, therefore, summary judgment could provide injunctive relief. The Trust contends that Jay blocked the easement with a locked gate that required a key and that Jay placed obstacles in the easement for extended periods of time. Jay argues that summary judgment was not proper because there is a genuine issue of material fact whether Jay's actions substantially interfered with the Trust's use and enjoyment of its easement. Jay cites *52 his declaration showing that he provided Jim with a key to the lock and that Jim "would have accessed the property * * * the same way that he has for the past twenty plus years, by using his key to the lock on the gate." Also, Jay declared that he did not intentionally place obstacles to block access and that family members "could get around any supposed obstacles." Jay concludes that the court erred in granting summary judgment. The comparative rights of parties to an easement are familiar. An easement owner is limited to the uses of the easement that are reasonably necessary to accomplish the easement's intended purpose. Bolduc v. Thompson , 238 Or. App. 625, 630, 245 P.3d 131 (2010). The owner of the servient estate retains the right to use that land, but that use cannot "unreasonably interfere with easement owner's use." Id . Previously, we have observed that whether a "servient estate owner's use of land that is subject to an easement substantially interferes with the easement owner's use of the easement is a question of fact." Id . The easement owner has the "burden of demonstrating that the interference with use of the easement is substantial." Id. at 631, 245 P.3d 131.
In this case, the parties dispute whether Jay's actions substantially interfered with the Trust's use of its easement. Again, viewing the record in the light most favorable to Jay, we conclude that a genuine issue of material fact remains. Jim had a key to the gate; Jay denies that obstacles obstructed ingress or egress; and Jay presents a different view of the altercation at the gate. On this record, a factfinder must decide whether Jay's actions substantially interfered with the Trust's use of the easement.
Presumably, the court would sit as that factfinder where an injunction is sought. See, e.g. , Krein v. Szewc , 287 Or. App. 481, 485-91, 403 P.3d 520 (2017) (trial court sitting as factfinder on injunction request). The Trust's motion, however, was urged as a matter of summary judgment, and the trial court made no record of resolving disputed facts as if in a trial to the bench. Rather, the court issued a letter opinion appearing to grant an injunction as a matter of summary judgment. Accordingly, the trial court erred in granting a permanent injunction as a matter of summary judgment on a record that presented disputed facts.
*53 To summarize, we affirm the judgment for the Trust on its claim for quiet title and against the counterclaims for breach of contract, quiet title, and fraud. We reverse and remand the judgment with respect to the dismissal of the counterclaims for unjust enrichment *742 and quantum meruit . Finally, we reverse and remand the judgment's grant of injunctive relief for the Trust as a matter of summary judgment.
Portions of judgment granting plaintiff injunctive relief and dismissing defendant's counterclaims for unjust enrichment and quantum meruit reversed and remanded; otherwise affirmed.

A Measure 37/49 claim is a claim asking local authority to decide whether to compensate owners for diminished property value or to permit development under earlier standards. See Corey v. DLCD , 344 Or. 457, 460, 184 P.3d 1109 (2008) (describing measures).

In his declaration, Jay said that Lots 2404 and 2401 were known as "Wilsada Park."

Having been contested before the trial court, we consider plaintiff's arguments about the statute of limitations to be urged in support of the trial court's dismissal as a basis to affirm the trial court as "right for the wrong reason." See Outdoor Media Dimensions v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) (explaining alternate standard by which to affirm trial court's conclusion).

As noted earlier, the Trust asserted an affirmative defense of laches against Jay's counterclaims.

In relevant part, ORS 12.080(1) provides that "[a]n action upon a contract or liability, express or implied, * * * shall be commenced within six years."

One of the illustrations posits this situation:
"11. Father and Mother, holding Blackacre as joint tenants, encourage Son and Daughter-in-Law to build a house on one corner of the property. Son and Daughter-in-Law spend $100,000 on improvements, residing on the property until their marriage is dissolved five years later. In subsequent litigation, Daughter-in-Law asserts that Father and Mother repeatedly promised that the improved tract would be given to her and her husband, or left to them by will. Father, Mother, and Son all deny that any such promise was made. Whether or not there was a promise, it is established that the improvements were made with the acquiescence of Father and Mother, in the reasonable expectation by Son and Daughter-in-Law that they would eventually become the owners of the improved tract. The improvements-to which Son and Daughter-in-Law contributed equally-increase the value of Blackacre by at least $100,000. Daughter-in-Law has a claim against Father and Mother under this section to recover $50,000, secured by an equitable lien on Blackacre."
Restatement § 27 comment e, illustration 11.

One of the illustrations posits this situation:
"8. Purchaser orally agrees to pay Vendor $35,000 for 10 acres of land and a mobile home. Purchaser occupies the premises for two years, paying a total of $17,000 toward the purchase price and spending $5,000 on a septic tank and other improvements. Vendor repudiates the agreement and orders Purchaser to leave the property, selling it to someone else at a higher price. Partial performance of an oral contract to purchase realty does not make the contract enforceable in this jurisdiction. Purchaser has a claim against Vendor under this section to recover $17,000 less the value of two years' use and occupation. Purchaser's restitution claim in respect of improvements is within § 27. The measure of recovery on this aspect of the case may reflect a finding that Vendor bears responsibility for his own unjust enrichment (§ 52(1)(c) )."
Restatement § 31 comment f, illustration 8.

Our conclusion does not preclude the trial court from determining, based on further development of the evidence that (1) Jay unreasonably delayed bringing the counterclaims, (2) despite full knowledge of all relevant facts, and (3) caused such substantial prejudice to the Trust as to make it inequitable to grant relief. Mattson , 301 Or. at 419, 723 P.2d 996 (outlining laches).

Jay's affirmative defense, which asserted fraud albeit in more summary terms, asserted that Jay was "fraudulently induced" to make payments and perform services.

Although Jay's declaration asserted that Jim's representations were repeated in recent years, Jay did not amend or even seek to amend his fraud claim so as to base the claim on recent representations that may have occurred after Jim "changed his mind" about the family plan. Consequently, we review the fraud claim as pleaded.